Matthew M. Durham (#6214)
Justin B. Palmer (#8937)
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT  84111
Telephone:   (801) 328-3131

*Attorneys for Defendant eBay Inc.*

FILED IN UNITED STATES DISTRICT

DEC 12 2003

BY:
EPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JEANA KUCZMANSKI,<br><br>              Plaintif,<br><br>v.<br><br>EBAY INC. and DOE DEFENDANTS I<br>through X,<br><br>              Defendants. | **MEMORANDUM IN SUPPORT OF<br>DEFENDANT EBAY INC.'S MOTION<br>FOR SUMMARY JUDGMENT**<br><br>Case No. 2:02CV-1009<br><br>The Honorable Dee Benson<br><br>(ORAL ARGUMENT REQUESTED) |

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, defendant eBay Inc.

hereby submits this memorandum in support of its Motion for Summary Judgment.



# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENTS ........................................................ 2

    I.      Hostile Work Environment ................................................................................ 3

    II.     Disparate Treatment ......................................................................................... 4

    III.    Retaliation ......................................................................................................... 5

    IV.   Negligence ......................................................................................................... 5

    V.     Assault............................................................................................................... 5

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................ 6

    I.      Allegations Relevant To Plaintiff's Hostile Work Environment Claim. .............. 6

    II.     Allegations Relevant To Plaintiff's Disparate Treatment Claim....................... 18

    III.    Allegations Relevant To Plaintiff's Retaliation Claim. ...................................... 21

    IV.   Allegations Relevant To Plaintiff's Common Law Negligent Supervision
         Claim.............................................................................................................. 28

    V.     Allegations Relevant To Plaintiff's Assault Claims. ........................................ 28

STANDARD FOR SUMMARY JUDGMENT.......................................................................... 29

ANALYSIS .......................................................................................................................... 30

    I.      Plaintiff Has Failed To Establish a Claim For Hostile Work Environment. ....... 30

         A.     The Undisputed Facts Prove That Porter Did Not Embarrass
              Plaintiff Because Of Her Gender, Nor Did He Single Out Women. ....... 31

         B.     Although Plaintiff Alleges That Porter Used Demeaning Terms,
              the Terms Were Gender Neutral, and Were Not Directed At
              Plaintiff Because Of Her Gender. ............................................................ 32

         C.     Plaintiff's "Eleventh Hour" Allegations Of Improper Sexual
              Comments Were Not Even Directed At Her, and Are Not Severe
              and Pervasive Enough To Create a Hostile Work Environment.............. 34

         D.     Even If Plaintiff Has Established a Hostile Work Environment,
              eBay Cannot Be Held Vicariously Liable Under the Faragher-
              Ellerth Defense.................................................................................... 36

             1.     eBay Exercised Reasonable Care By Having a
                     Comprehensive Sexual Harassment Policy In Place During
                     the Relevant Time Period............................................................. 36

             2.     Plaintiff Unreasonable Failed To Take Advantage Of the
                     Avenues Of Redress Because She Never Complained
                     About the Alleged Sexual Harassment. ........................................ 37

3.       When Plaintiff Did Complain About Alleged Improper Conduct, eBay Took Prompt and Effective Remedial Action. ........................................................................ 40

i.       eBay Took Prompt and Effective Remedial Action Regarding Plaintiff's Complaint That Porter Yelled At Her Publicly For Failing to Log Into the Log Book. ................................................................ 41

ii.      eBay Took Prompt and Effective Remedial Action Regarding Plaintiff's Complaint That Porter Told Her That "She Could Date Women." ....................... 42

iii.     eBay Took Prompt and Effective Remedial Action Regarding Plaintiff's Complaint That Porter "Would Come Around Her Desk." .................................. 43

iv.      eBay Took Prompt and Effective Remedial Action After Plaintiff Complained To Scott Newman. .............. 43

II.     Plaintiff Has Failed To Establish a Claim For Disparate Treatment. .................. 44

A.      Plaintiff Cannot Prove That eBay Discriminated Against Her By Refusing Her Requests For Promotions. .................................................... 44

B.      Plaintiff Cannot Prove That eBay Discriminated Against Her By Refusing Her Request For Overtime. ....................................................... 48

III.    Plaintiff Has Failed To Establish a Claim For Retaliation Under Title VII. ....... 49

A.      eBay's Retaliation Claim Must Be Dismissed Because Plaintiff Did Not Present the Claim to the UALD/EEOC In Her Charge of Discrimination. ................................................................................. 49

B.      Even If Plaintiff Did Exhaust Her Administrative Remedies, Her Retaliation Claim Clearly Fails On the Merits. ....................................... 49

1.       eBay Had a Legitimate Business Reason For Counseling Plaintiff For Misusing Her Personal eBay Account; Further, Plaintiff Admits That She Has No Evidence Proving the Counseling At Issue Was Retaliatory. ......................................... 51

2.       Plaintiff's Performance Reviews Were Not Discriminatory; To the Contrary, They Were, Based On the Undisputed Facts, Completely Objective and Justified By Her Performance. ............................................................................... 52

3.       Plaintiff's Remaining Allegations of Retaliation Do Not Constitute Adverse Employment Actions As a Matter of Law; Further, Plaintiff Admits That She Has No Evidence To Prove the Remaining Allegations Were Retaliatory. .............. 55

i.       The Remaining Allegations Do Not Constitute "Adverse Employment Actions." ...................................... 56

ii.      Regardless, Plaintiff Admits She Has No Evidence
Whatsoever Proving the Remaining Allegations
Were Retaliatory. ............................................................ 57

IV.    Plaintiff's Common-Law Negligence Claim Must Be Dismissed For Three
Independent Reasons: It Is Barred By the Utah Workers' Compensation
Act; It Is Barred By the Utah Anti-Discrimination Act; and It Is
Duplicative of Plaintiff's Title VII Claim. ............................................................ 59

A.    Plaintiff's Negligence Claim Is Barred By the Utah Workers'
Compensation Act As a Matter of Law. ...................................... 59

B.    Plaintiff's Negligence Claim Is Barred By the Utah Anti-
Discrimination Act As a Matter of Law. .................................... 60

C.    Plaintiff's Negligence Claim Must Be Dismissed, As a Matter of
Law, Because It is Duplicative of Her Title VII Claim. .......................... 62

V.    Plaintiff Has Failed To Establish A Claim For Assault. ...................................... 63

A.    Plaintiff's Allegations of "Verbal Abuse" Are Time-Barred. .................. 64

B.    Even If They Are Not Time-Barred, Plaintiff's Allegations Of
"Verbal Abuse" Cannot Constitute Assault As a Matter of Law. ............ 64

C.    Porter's Statement That He Would "Kill Any Terrorist Who
Stepped Foot On His Property" Cannot Constitute Assault As a
Matter of Law. ........................................................................ 65

CONCLUSION ............................................................................................................ 67

## INTRODUCTION AND SUMMARY OF ARGUMENTS

Plaintiff Jeana Kuczmanski-Thornton ("Plaintiff") is a former employee of eBay Inc. ("eBay"), which operates an online marketplace.[1]  Plaintiff worked at eBay's Salt Lake facility. Employees at eBay's Salt Lake facility, like Plaintiff, where primarily dedicated to providing customer support services to eBay's customers.

In September, 2002, Plaintiff initiated this action alleging, *inter alia*, that she was the victim of sexual harassment by her supervisor, Chris Porter ("Porter").  During the course of her employment at eBay, Plaintiff did, in fact, complain to eBay's Human Resources Department that Porter yelled at her for violating eBay work rules, that he made derogatory comments such as "you ask stupid questions" or "that's my name don't wear it out"; and that he would stand near her desk.  However, while Plaintiff characterized, and still characterizes, the above incidents as "discriminatory," virtually all of the incidences of which she complained lacked an explicit, or implicit, sexual or gender-based component.  In fact, on more than one occasion, Plaintiff stated that Porter treated men and women the same.

Nevertheless, upon receiving Plaintiff's complaints, eBay took action, the day the complaints were made, to remedy the problems, and actually did resolve the problems to Plaintiff's satisfaction.  Porter received written and verbal warnings from his supervisors regarding his unprofessional and boorish conduct, not to mention a substandard performance review, which resulted in a significantly reduced raise for that particular year.

Even though Plaintiff had been satisfied with eBay's prompt and effective remedial action, several months later she filed a Charge of Discrimination with the Labor Commission of Utah Anti-Discrimination Division and the EEOC, just weeks after Plaintiff—who, as mentioned

---

[1]     Using eBay's Internet site, tens of millions of eBay sellers list items for sale to other eBay users.

above, was a member of the Customer Support team—had been placed on a final written warning by her new manager for violating several eBay policies, including verbally abusing and threatening an eBay customer.  Like her earlier complaints to Human Resources, Plaintiff's Charge alleged that Porter sexually harassed her by yelling at her, by making gender-neutral derogatory comments, and by generally treating her with "disrespect and sarcasm."  The Charge, however, was conspicuously devoid of *any* specific allegations that Porter made sexually inappropriate comments to Plaintiff.  Remarkably, Plaintiff's Verified Complaint filed with this Court is also devoid of such allegations.  So are her answers to eBay's Interrogatories.  In fact, Plaintiff did not allege that Porter made inappropriate sexual comments until her deposition was taken in August of 2003, almost a year after her Complaint was filed.  In her deposition, Plaintiff stated, for the first time, that Porter frequently "talked about sex and S and M," that he referred to women as "eye candy," and that he told her she had "sexy legs."  Apparently realizing that the allegations contained in her Charge, her Complaint, and her answers to eBay's Interrogatories were insufficient, the above "eleventh hour" allegations of improper sexual comments have now surfaced as part of Plaintiff's sexual harassment claims.

The unreliability and contradictory nature of Plaintiff's allegations aside, her allegations, even if assumed true, are, for the reasons set forth below, clearly insufficient to state an actionable claim against eBay.  Accordingly, Plaintiff claims against eBay should be dismissed as a matter of law.

## I.      Hostile Work Environment

Plaintiff has failed to make out a prima facie claim for hostile work environment.  The undisputed facts clearly establish that (1) although Plaintiff's supervisor publicly yelled at her for violating eBay work rules, he also publicly yelled, as Plaintiff admits, at many employees, "male and female," i.e., he was an equal opportunity yeller; (2) although Plaintiff's supervisor used

demeaning language such as "you ask stupid questions" or "that's my name don't wear it out," the language, however boorish and unprofessional, was gender neutral and directed at all employees, male and female alike; and (3) although Plaintiff has now raised "eleventh hour" allegations that her supervisor made improper sexual comments, the alleged comments, as Plaintiff admits, were not even directed at Plaintiff, and are, regardless, not severe and pervasive enough to create a hostile work environment as a matter of law.

Moreover, and perhaps most importantly, even if Plaintiff had established a hostile work environment, eBay cannot be held vicariously liable as a matter of law under the *Faragher-Ellerth* affirmative defense. The undisputed facts clearly establish (1) that eBay exercised reasonable care to prevent sexual harassment by having a comprehensive anti-harassment policy in place during the relevant time period, and that Plaintiff was aware of and actually read the policy several times; (2) that Plaintiff unreasonably failed to take advantage of the avenues of redress because she ***never*** complained about the alleged inappropriate sexual comments to eBay's Human Resources Department or to eBay management; and (3) that when Plaintiff did report inappropriate conduct (albeit conduct that lacked an explicit sexual component, such as yelling), eBay took prompt and effective action to remedy the offending behavior, and did, in fact, remedy the offending behavior.

## II.  Disparate Treatment

Plaintiff has failed to establish the elements of a prima facie claim for disparate treatment.  Although Plaintiff complains that she was not selected for certain positions, she admits that she has no information whatsoever regarding (1) whether she was actually qualified for the positions for which she applied; (2) who eBay actually hired for the positions for which she applied (including whether they were male or female); and (3) the selected applicants'

qualifications and experience.  Absent such evidence, Plaintiff cannot state a prima facie claim for gender-based discrimination.

## III.   Retaliation

Plaintiff's claim that she was retaliated against by eBay for reporting what she believed to be inappropriate/rude conduct fares no better than her hostile work environment claim.  As an initial matter, Plaintiff's retaliation claim must be dismissed as a matter of law because Plaintiff's Charge of Discrimination simply did not address retaliation.  However, even if Plaintiff had exhausted her administrative remedies, her allegations of retaliation clearly fail because (1) they do not constitute adverse employment actions as a matter of law, and/or (2) because Plaintiff, as she admits, has no evidence whatsoever to establish a causal connection between the protected activity and the alleged adverse actions, and/or (3) because eBay had legitimate, nondiscriminatory reasons for engaging in the challenged activity.

## IV.   Negligence

Plaintiff's negligence claim is merely a common-law cause of action alleging sexual discrimination by reason of sexual harassment in the workplace.  Such a claim cannot survive, under well-established federal and Utah law, for three independent, but equally important, reasons: it is barred by the exclusive remedy provision of the Utah Workers' Compensation Act; it is barred by the exclusive remedy provision of the Utah Anti-Discrimination Act; and it is duplicative of her Title VII hostile work environment claim.

## V.   Assault

In support of her assault claim, Plaintiff alleges that her supervisor publicly yelled at her for violating eBay work rules, and on another occasion stated that he "would kill any terrorist who stepped foot on his property."  These allegations, however, cannot constitute assault as a

matter of law because (1) Plaintiff's allegations of "verbal abuse" are time barred; (2) even if they are not time-barred, Plaintiff has not alleged that her supervisor, while publicly reprimanding her, threatened her with bodily harm, or that he did any other act to put Plaintiff in reasonable apprehension of an imminent harmful or offensive contact with her person; and (3) Plaintiff's supervisor's statement that he would kill a terrorist was not even directed at Plaintiff (Plaintiff's supervisor never said Plaintiff was a terrorist), and even if it was, it was "forward-looking," and therefore not actionable.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

In support of her various causes of action, Plaintiff has raised numerous allegations of harassment/inappropriate conduct on the part of eBay and its employees.  eBay steadfastly disputes Plaintiff's characterization of many of the facts.  Moreover, many of Plaintiff's allegations have been expressly contradicted by various witnesses, including Chris Porter, Plaintiff's supervisor.

Nevertheless, the following is a statement of undisputed material facts taken primarily from Plaintiff's ***own deposition***, and presented largely in Plaintiff's ***own words***, for purposes of summary judgment only.  As discussed below, even assuming Plaintiff's allegations as true, Plaintiff has clearly failed to make out a prima facie claim for discrimination, retaliation, negligence, or assault.  Accordingly, Plaintiff's claims fail as a matter of law.

**I.      Allegations Relevant To Plaintiff's Hostile Work Environment Claim.**

1.      Plaintiff was hired by eBay in June of 2000.  *See* Deposition of Jeana Kuczmanski ("Kuczmanski Depo.) at 13:25 (the relevant portions of the Kuczmanski Depo. are attached hereto as Exhibit 1.); *see also* Plaintiff's Complaint (a copy of Plaintiff's Compl. is attached

hereto as Exhibit 2); *see also* Plaintiff's Charge of Discrimination.  (A copy of Plaintiff's Charge of Discrimination is attached hereto as Exhibit 3.)

2.      From approximately October of 2000 until October of 2001, Plaintiff worked primarily on eBay's "Phone Team" as a customer support representative.  Plaintiff's supervisor during this period of time was Chris Porter ("Porter").  Kuczmanski Depo. (Ex. 1) at 17:11-20.[2]

3.      In her answers to eBay's Interrogatories, and in her deposition, Plaintiff raises numerous allegations of sexual harassment/inappropriate conduct.  All of the inappropriate/harassing conduct of which Plaintiff complains was allegedly perpetrated by Plaintiff's supervisor—Porter.  *See* Pl.'s Responses to eBay's Interrogatories.  (A copy of Pl.'s Responses to eBay's Interrogs. is attached hereto as Exhibit 4.)  The specific conduct Plaintiff alleges constituted harassment is as follows:

3(a).      In "October of 2000," Porter asked Plaintiff to assist with "call backs." Kuczmanski Depo. (Ex. 1) at 32:8, 12-22.  Plaintiff telephoned one eBay member who she had allegedly helped the day before, and told the member that if his problem had not been resolved, he could "give [her] a call [back.]."  *Id.* at 32:19-21.  After she "hung up," Plaintiff claims "[Porter] became infuriated and started yelling at [Plaintiff] at the top of his lungs," stating: "You don't know if you talked to that guy. . . . Why are you telling him to call back?  He doesn't have the number."  *Id.* at 32:22-25; 33:1-3.  Plaintiff responded, "He does have the number.  I called him.  He called yesterday . . . ."  *Id.* at 33:4-7.  After this exchange, Plaintiff became "really upset and extremely humiliated" and "went to the bathroom . . . crying."  *Id.* at 34:1-3.  "[L]ater that afternoon," Plaintiff spoke with Porter "privately" about the incident, and told him that she

---

[2]      During this period of time, Plaintiff also worked on a "Special Project Team," which was still under the supervision of Porter.  Kuczmanski Depo. (Ex. 1) at 18:1-7.

"did not ever want him to yell at [her] . . . again." *Id.* at 34:15-24. Porter stated, "Okay, . . . just don't tell people to call back." *Id.* at 35:1-4.

3(a)(i).       Plaintiff did **_not_** report the above incident to "anyone at eBay." *Id.* at 35:24-25; 36:1 ("Q: Okay. Did you ever report Mr. Porter's conduct that day to anyone at eBay? A: No, I did not.").

3(b).    Plaintiff alleges that, around the same period of time, Porter would talk about "sex, . . . about S and M and bondage," *id.* at 41:8-15; and that he would "refer to women as eye candy. . . . He would always talk, you know, he would talk about tits and people's ass." *Id.* at 48:11-20.[3]

3(b)(i).       Plaintiff admits that the above statements were generalized comments that were **_not_** directed at her. *See id.* at 49:18-20; *see also id.* at 41:8-23.

3(b)(ii).       Moreover, the conduct of which Plaintiff complains, and which was outlined above, was not limited to Plaintiff individually, or to women more generally. *See id.* at 46:16-22 ("Q:  Okay.  And when these comments were made, were they sort of made generally so that anyone [on your team] could hear them. A:  Yes.").

3(b)(iii).       Plaintiff testified that she "didn't pay very much attention" to the above alleged conversations. *Id.* at 43:13.

3(b)(iv).       Importantly, Plaintiff admits that she did **_not_** complain to anyone in Human Resources or the Legal Department about the above conduct. *See id.* at 51:8-10. ("Q: And you didn't complain to anyone else [(other than co-workers)] at eBay about it? A: No."); *see also id.* at 180:9-15 ("Q: I think you testified that you **_never_** reported to anyone at

---

[3]       Porter expressly denied making these and other statement attributed to him by Plaintiff. *See, e.g.,* Deposition of Chris Porter ("Porter Depo.") at 120-22, 147.  (The relevant portions of the Porter Depo. are attached hereto as Exhibit 5).  However, eBay does not dispute Plaintiff's allegations for purposes of this Motion only.

H.R. or eBay management about Mr. Porter's sexual comments.  A: . . . Yes.") (emphasis added).

3(c).    Plaintiff also alleges that on "one" occasion Porter said that she "had sexy legs"; that he would "undress her with his eyes"; and that he would "talk to her chest."  *Id.* at 74:24-25; 75:1-25; 76:1-9; 78:2-6; 106-107.

3(c)(i).        Plaintiff admits that she *__never__* complained to Porter about any of the above comments, and that she *__never__* complained to Human Resources or to the Legal Department about any of the above comments:

| | |
|---|---|
| A: | Well, summertime started to come around, and I was wearing shorts, and he commented on my legs. |
| Q: | What did he say? |
| A: | "Your legs look sexy. . . ." |

\* \* \*

| | |
|---|---|
| Q: | ***Did you report that comment to anyone?*** |
| A: | ***No*** . . .  He was always eyeing me, you know, like undressing me with his eyes, that type of thing. . . . |

\* \* \*

| | |
|---|---|
| Q: | ***Did you ever talk to [Porter] about his looking at you?*** |
| A: | ***No.*** . . . |

\* \* \*

| | |
|---|---|
| Q: | ***Okay.  So you never talked to Mr. Porter about him looking at you in a way that made you uncomfortable.  Did you ever talk to anyone else at eBay about it?*** |
| A: | ***Just my coworkers.*** |

\* \* \*

| | |
|---|---|
| A: | [Plaintiff then describes how Porter "Talks to her chest"] |
| Q: | ***Once again, you never talked to him about this, correct?*** |
| A: | ***Correct.*** . . . |

\* \* \*

| | |
|---|---|
| Q: | ***And you never went to anyone in H.R. or eBay management about that issue either, did you?*** |
| A: | ***No.*** . . . |

*Id.* (emphasis added); *see also id.* at 180:9-15 ("Q: I think you testified that you *__never__* reported to anyone at H.R. or eBay management about Mr. Porter's sexual comments.  A: . . . Yes.") (emphasis added).

3(d).    Towards the end of April 2001, Plaintiff arrived at work, turned on her computer, and then stepped away from her computer to get a cup of coffee. *Id.* at 56:22-24. When Plaintiff returned, Porter allegedly stated, "Why didn't you log into the logbook?" *Id.* at 57:13-14. Plaintiff responded, "I was going to." *Id.* at 57:15. A coworker who was sitting nearby, Keith List, then allegedly "stood up and faced Chris Porter . . . and said, 'You need to back off.'" *Id.* at 57:19-22. Porter allegedly told List, "with clenched fists," to "keep out of this." *Id.* at 57:23. Apparently, Porter then turned to Plaintiff and, while he was "pounding" the log book with his finger, stated: "You need to fill this logbook out, . . . people have been fired for timecard fraud." *Id* at 58:6-25. Porter then "walked off." *Id.*

3(d)(i).    Immediately after the above incident, Plaintiff reported Porter's conduct to Juli Adams, eBay's Human Resources Coordinator. Plaintiff did ***not*** ask to be transferred, and Adams told Plaintiff that she would "look into it." *Id.* at 61:20; 62:2-3.

3(d)(ii).    That same day, Adams instructed Nita Call, Porter's manager, to address the situation with Porter. *See* Affidavit of Juli Adams ("Adams Aff.") at ¶ 5. (A copy of the Adams Aff. is attached hereto as Exhibit 6.) In accordance with Adams' instructions, Call and another manager, Janet Farson, discussed the incident with Porter; instructed him to "take all sensitive matters into a conference room"; and told him to "treat all team members with respect." *See* Nita Call's Report dated June 1, 2001. (A copy of Nita Call's June 1, 2001 Report is attached hereto as Exhibit 7.) Porter was also instructed that he should not counsel employees when "emotion" was involved, and that if he was discussing a sensitive subject, he should have another person attend the meeting. *See id.*

3(d)(iii).    In addition to receiving a verbal warning, Porter met

with Plaintiff and another coworker the same day in an attempt to resolve the dispute.  In the

meeting, Plaintiff told Porter that she "didn't appreciate him yelling at [her] in front of other

people and that it was really humiliating . . . ."  Kuczmanski Depo. (Ex. 1) at 64:12-17.  Porter

stated: "Well, you know, you're a good worker, and you're really smart and independent, and,

you know, I'd like my daughter to grow up to be someone like you."  *Id.* at 66:15-18.  Porter

then stated that "he *wouldn't do it again*."  *Id.* at 66:19-24 (emphasis added).  As a result of the

meeting, Nita Call reported that "Chris ha[d] apologized to Jeana and they seem to have worked

out any difficulties concerning the log in book."  *See* Nita Call's June 1, 2001 Report (Ex. 7); *see*

*also* Adams Aff. (Ex. 6) at ¶ 8 ("Thornton told me that Porter had apologized and that the matter

had been resolved.").

              3(d)(iv).      Moreover, in Porter's 2001 Performance Review, it was

specifically stated that Porter "has had some challenges this past year with a couple of team

members"; that "[i]nappropriate comments were overheard as well as prefaced to an individual

[Plaintiff] who took exception to this behavior"; and Porter "was verbally warned regarding his

professionalism"; but that eBay "had seen growing improvement in [these] area[s] since his

Verbal Warning regarding such."  *See* Porter's 2001 Performance Review at 2-4.  (A copy of

Porter's 2001 Performance Review is attached hereto as Exhibit 8.)

              3(d)(v).      As his Review makes clear, Porter received "below

acceptable level" or "expectations not fully met" ratings in the following assessment categories:

Leadership/Dependability; Working With Others; and Hire and Retain Good People.  *See id.*  As

a result, Porter's raise was significantly less than it had been in 2000.  *See* Porter Depo. Vol. II

(Ex. 5) at 53:16-25; 54:1-5; *see also* Deposition of Jeff Anderson ("Anderson Depo.") at 103:25;

104:1-13.  (The relevant portions of the Anderson Depo. are attached hereto as Exhibit 9.)

3(d)(vi).      After Porter was reprimanded, Plaintiff never reported another incident where Porter yelled at her, either publicly or privately.

3(e).    In approximately April, 2001, Plaintiff alleges that Porter told her that eBay would not "hire people who are going to college because, you know, *they expect a big time commitment from their supervisors*, and someone like you, they wouldn't hire you *because you're getting a master's degree*." Kuczmanski Depo. (Ex. 1) at 97:16-20 (emphasis added).

3(e)(i).      Plaintiff admits that the above comment involved her schooling, not her gender. *Id.* at 97:16-25; 98:1-8 (emphasis added).

3(e)(ii).      Importantly, Plaintiff admits that she never reported the above comment to anyone at human resources or eBay management:

> Q:   *Okay. Did you report to anyone in eBay management or H.R. about this comment that he made about your schooling*?
> A.   *No*.
> Q:   Any of these comments that he made about your schooling?
> A:   *(The witness shook her head from side to side.)*

*Id.* at 99:14-21 (emphasis added).

3(f).    Also in approximately April, 2001, Plaintiff alleges that she requested overtime from Porter and Porter stated: "Oh, no. I'm only giving overtime to people with *family needs*. You're single, and you don't need overtime." *Id.* at 68:21-23 (emphasis added).

3(f)(i).      Plaintiff alleges that Porter selected two women—"Vicky," who was married and whose husband had been laid off, and Ardis Weight, who was newly married—for overtime over her. *Id.* at 72:3-25.

3(f)(ii).      Plaintiff alleges that after Porter made the above comment, she reported it to Janet Farson, Porter's manager, and requested that Janet transfer her off Porter's team. *See id.* at 69:2-12. According to Plaintiff, Farson stated: "you should just stay

'cause it's a high profile team, and it will really get you recognized and could get you a promotion . . . ." *Id.* at 120:17-23.  In response, Plaintiff stated:  "I don't know, I'll have to think about it." *Id.* at 121:7-8.  Later, Plaintiff told Janet Farson that she did ***not*** want the transfer. *See id.* at 121:14-17.

3(f)(iii).      Plaintiff admits that after she "complained to management, [Porter] offered [her] four hours – four to six hours overtime at the end of the day." *Id.* at 73:5-8. However, Plaintiff declined his offer because she had "already made plans for this weekend." *Id.* at 70:5-9.

3(g).    Plaintiff alleges that on one occasion, in approximately April, 2001, Porter "resisted" signing an "intent to apply" form—a form indicating that Plaintiff intended to apply for a certain position.  Plaintiff states:

> A:      . . . I turned in my intent to apply, and he said, "Oh, I'm not going to –
> they're not going to have the position.  It's closed already."
>          And I said, "Well, its not closed 'cause it's still posted on the job
> opening site."
> * * *
> ***And he signed it, and I turned it in*** . . . .

*Id.* at 99:24-25; 100:1-17 (emphasis added).

3(h).    Plaintiff alleges that in or about October of 2001, she had been discussing an upcoming eBay party with another coworker, and was expressing her concern that she could not find a date for the party.  Plaintiff alleges that Porter overheard this conversation and stated, "You know Jeana, you can always date women." *Id.* at 88:13-15.[4]

3(h)(i).      After Porter made the above comment, Plaintiff "marched right down to H.R. and reported it [to Adams]." *Id.* at 89:10-11.

---

[4]      Porter expressly denied making this statement in his deposition. *See* Porter Depo. Vol. II (Ex. 5) at 25.  However, eBay does not dispute Plaintiff's allegations for purposes of this Motion only.

3(h)(ii).        Plaintiff testified that she told Adams that Porter looked at her and said: "You know, you can always date women.  If you want to be a lesbian, that's fine with me."  *Id.* at 92:7-13.  Plaintiff states that Adams "wrote down some notes" and said, "Well, we'll check this out."  *Id.* at 92:17-20.

3(h)(iii).        Plaintiff did not mention to Adams that Porter had engaged in any other sexually harassing behavior; her complaint concerned only the above isolated comment.  *See* Adams Aff. (Ex. 6) at ¶ 10.

3(h)(iv).        Immediately after receiving this complaint from Plaintiff, Adams met with Porter's manager, Call, and told Call that the situation needed to be addressed promptly.  *See id.* at ¶ 11.

3(h)(v).        In accordance with Adams' instructions, Call met with Porter the same day, and informed Porter that Plaintiff was upset about the conversation that had taken place.  Porter explained to Call that "his comment had nothing to do with [Plaintiff's] sexual preference, but was just a comment that she could go [to the party] with a girl."  *Id.* at ¶ 12; *see also* Nita Call's Report dated October 23, 2001 Report ("As soon as I was informed of this incident [by Adams], I met with [Porter]. . . .  [Porter] explained that the group was talking about finding dates and joking about the party . . . [and that] his comment had nothing to do with [Plaintiff's] sexual preference, but was just a comment that she could go with a girl.").  (A copy of Nita Call's October 23, 2001 Report is attached hereto as Exhibit 10.)

3(h)(vi).        Nevertheless, Call counseled Porter, and advised him "to keep his comments professional and business related."  *See id.*

3(h)(vii).        Moreover, in Porter's 2001 Performance Review, it was specifically mentioned that Porter "was verbally warned regarding his professionalism" and was

"coached not to make off handed remarks even if he is joking"; and that eBay had "seen growing improvement in these areas since his Verbal Warning." *See* Porter's 2001 Performance Review (Ex. 8) at 2-4.

        3(h)(viii).     Porter received "below acceptable level" or "expectations not fully met" ratings in the following assessment categories as a result of the above conduct: Leadership/Dependability; Working With Others; and Hire and Retain Good People. *See id.* Consequently, Porter's raise for 2001 was significantly less than it had been in 2000. *See* Porter Depo. (Ex. 5) at 53:16-25; 54:1-5; *see also* Anderson Depo. (Ex. 9) at 103:25; 104:1-13.

        3(I).    Porter ceased being Plaintiff's supervisor in approximately October of 2001. *See* Kuczmanski Depo. (Ex. 1) at 17:9-15. However, on November 15, 2001, Plaintiff completed a Supervisor Evaluation Form for Porter. In this evaluation, Plaintiff reiterated many of the allegations mentioned above. Specifically, Plaintiff stated that Porter would make rude comments like "that's my name don't wear it out"; that he was unapproachable; and that he said she asked stupid questions. *See* Porter's 2001 Supervisor Evaluation Form. (A copy of the 2001 Supervisor Evaluation Form is attached hereto as Exhibit 11.) However, Plaintiff did not mention **_any_** allegations of sexual harassment or inappropriate sexual comments, *see id.*, and specifically noted that Porter treated all his subordinates similarly—"men and women alike." *Id.*

        3(I)(i).     After completing the Supervisor Evaluation, Plaintiff inexplicably sent it via e-mail to Scott Newman, eBay's Vice President of Customer Support. *See id.*

        3(I)(ii).     When Newman received the e-mail, he immediately responded to Plaintiff, and told her that he would "follow up." *See id.*

3(I)(iii).     That same day, Plaintiff met with Newman in a conference room and Newman told Plaintiff that he "felt really sorry for [her]," and that he would "look into [the matter]" further. Kuczmanski Depo. (Ex. 1) at 132:6-15.

3(I)(iv).     Newman then requested information from Human Resources, and Call and Farson explained that Porter had already been counseled for the alleged misconduct, and that there had been "no other instances or complaints brought to [their] attention." *See* November 20, 2001 E-Mail. (A copy of the November 20, 2001 e-Mail is attached hereto as Exhibit 12.) Newman was also informed that Human Resources had been coaching Porter on the following: "maintain a positive and upbeat demeanor when working with his team"; "handling situations privately, away from others"; "addressing issues when emotions are not involved"; and that Human Resources "will be sitting in on team meetings and CSR one on ones." *See id.*

3(I)(v).     Jeff Anderson, eBay's Human Resources Manager, then met with Plaintiff and told her that Porter had "been put on some kind of plan, like action plan [(as discussed above)], and that they had addressed the situation." Kuczmanski Depo. (Ex. 1) at 133:8-9.

3(j).     In approximately February, 2002, after Plaintiff had moved off Porter's team, Plaintiff alleges that Porter would "come around [Plaintiff's] desk" and "stop and talk to the person next to" her: "He would just stop and start talking, chitchat about 'Oh, how's -- you know, do you watch sports? How's the weather?'" *Id.* at 108:7-11.

3(j)(i).     Plaintiff alleges that when Porter would "come around her desk" he would ***never*** talk to her in particular, nor did he ***ever*** mention her name or say anything about her. *Id.* at 109:24-25; 110:1.

3(j)(ii).        Plaintiff also admits that although she did not like Porter "coming around her desk," she never communicated this to Porter. *Id.* at 111:23-25; 112:1-2.

3(j)(iii).        Plaintiff nevertheless reported the above conduct to Jeff Anderson, and Anderson promptly investigated the alleged misconduct:

A:   Jeana approached me about [Porter] coming into her work area and . . .
                                    * * *
Q:   Okay. What did she tell you?
A:   She says that she frequently sees Chris down in her area near her desk, and would stare at her. . . .
Q:   Okay. Then what did you do?
A:   Asked her who else would have seen this, who else would have witnessed this behavior . . . . She gave me some names of some individuals.
Q:   ***So you gathered information and conducted an investigation***?
A:   ***Uh huh***.
Q:   Who did you interview?
A:   [Anderson names three individuals.]
                                    * * *
Q:   What was the result of your interview with them?
A:   Generally everybody had said that they either had really not seen him in the building . . . they hadn't really seen him in the area. . . . I mean everybody pretty much said the same thing, with the exception that [Porter] would stop and engage in conversation . . . kind of in passing.

Anderson Depo. (Ex. 9) at 75-76 (emphasis added).

3(j)(iv).        Even though all of the above witnesses had said that Porter would only pass through to say "hi," Anderson counseled Porter about the situation and told him to "not engage in behavior with [Plaintiff]," in an attempt to "try to avoid any further problems between the two individuals." *Id.* at 77:21-25.

3(k).        Plaintiff alleges that on one occasion Porter, after he was no longer Plaintiff's manager, "stared at her" while she got out of her car and walked into the building. Kuczmanski Depo. (Ex. 1) at 110:2-22. Plaintiff alleges that this made her feel uncomfortable. *Id.* at 115:25; 116:1-3

3(k)(i).        Plaintiff reported this incident to Jeff Anderson. *See id.*

3(k)(ii).        Anderson and Plaintiff "agreed to set up a separate meeting to get some more details . . . ." The day they were supposed to meet, Plaintiff "either had a conflict or something came up, and declined the meeting, and said that she would get back with [Anderson] to -- with a better time to meet . . . ." However, Anderson "never heard back" from Plaintiff regarding this issue. Anderson Depo. (Ex. 9) at 81-82.

## II.    Allegations Relevant To Plaintiff's Disparate Treatment Claim.

4.      In addition to her allegations of hostile work environment, Plaintiff alleges that eBay discriminated against her on the basis of her gender, in violation of Title VII. The specific conduct Plaintiff alleges constituted disparate treatment is as follows:

4(a).    Plaintiff alleges that eBay refused to promote or transfer her to any of the positions to which she applied.

4(a)(i).        However, Plaintiff admits that she has no information regarding who eBay actually hired for the positions to which she applied (including whether they were male or female), and/or that she has no knowledge or information regarding the selected applicants' qualifications and experience:

Q:    Okay, I want to kind of . . . just go down this list [of the positions Plaintiff applied for] and talk a little bit about each of these positions. With respect to the supervisor, customer support position on Page 5 of 7, do you know who got that position?
A:    *No.*
Q:    With respect to the senior customer support representative for the graveyard shift, do you know who got that position?
A:    *No.*
Q:    With respect to the supervisor for customer support for graves on the bottom of Page 5 of 7, do you know who got that position?
A:    *No.*
Q:    Moving on to Page 6 . . . there's an entry for senior customer support representative. Do you know who got that position?
A:    *No.*
Q:    Supervisor customer support, dash, fraud prevention. Do you know who got that position?

A:    *No.*

Q:    Senior customer support representative.  Do you know who got that position?

A:    *No.*

Q:    Senior customer support representative lead.  Do you know who got that position?

A:    *No.*

Q:    Supervisor of customer support.  Do you know who got that position?

A:    *No.*

Q:    . . . Customer support specialist.  Do you know who got that position?

A:    *No.*

Q:    And customer support specialist.  Do you know who got that position?

A:    *No.*

Q:    Are there other C.S.R. positions that you think you applied for that aren't on this list?

A:    *No.*

Q:    Okay.  There's a marketing position that you think you applied for that's not on this list?

A:    Yes.

Q:    Okay. And do you know who got that position?

A:    ***They closed the position and didn't fill it.***

Q:    Okay.  Are there any other positions that you can think of for which you applied?

A:    Yes.

Q:    And what's that?

A:    . . . database developer.

* * *

Q:    Do you know who got the position?

A:    Yes.

Q:    Who got it?

A:    Garrett Seeble.

* * *

Q:    What were the qualifications for the . . . database developer position . . . .

A:    Bachelor's degree preferred, experience working with databases, knowledge of Visual Basic, able to read and generate reports.

Q:    What—do you know what Mr. Seeble's position was when he applied. . . .

A:    *I don't.*

Q:    Do you know anything about his knowledge of Visual Basic?

A:    *I don't.*

Q:    Do you know anything about his ability to read and generate reports?

A:    *I don't.*

Q:    Do you know anything about his experience with working with databases?

A:    *I don't.*

Q:    Okay. Any other positions you can think of that you applied for that we haven't talked about today or yesterday?

* * *

A:      . . . the Community Watch department.
                                              * * *
Q:      Do you know who got the position?
A:      *I don't.*
Q:      Any other position that you recall for which you applied?
A:      No. Actually, yes. . . . An e-watch position.
                                              * * *
Q:      Do you know who got the position?
A:      *No.*
Q:      Anything else.  Any other positions?
A:      No.

Kuczmanski Depo. (Ex. 1) at 306-312 (emphasis added).

4(b).    Plaintiff also alleges that she applied for, and was denied, certain lateral transfers.  However, like the above promotional requests, Plaintiff admits that she does not know why her requests for transfers were denied, or who was selected for the transfers.

4(b)(i).        Plaintiff allegedly requested a transfer to the "Safe Harbor" department in July of 2001.  *Id.* at 118:11-21.  Plaintiff admits that she does not know who actually moved to Safe Harbor, *see id.* at 119:13-14, and that she does not "know how the decision was made who was being moved to Safe Harbor."  *See id.* at 119:15-17.

4(b)(ii).       Plaintiff allegedly requested a second transfer to Safe Harbor in September of 2001.  *Id.* at 118:23-25.  Plaintiff admits that she has no information regarding "who made the decision who went to Safe Harbor," *id.* at 120:8-9, or "who went to Safe Harbor in connection with that transfer. . . ."  *Id.* at 120:11-13.

4(b)(iii).      Plaintiff alleges that she requested a transfer around the end of April 2001 because Porter had denied her overtime.  *Id.* at 120:17-23.  Plaintiff states that when she requested the above transfer, Janet Farson, Porter's manager, stated: "you should just stay 'cause it's a high profile team, and it will really get you recognized and could get you a promotion . . . ."  *Id.*  In response, Plaintiff stated:  "I don't know.  I'll have to think about it."  *Id.*

at 121:7-8.  Later, Plaintiff told Janet Farson that she did **_not_** want the transfer.  *See id*. at 121:14-
17.

### III.    Allegations Relevant To Plaintiff's Retaliation Claim.

5.      In addition to her allegations of sexual harassment and disparate treatment,
Plaintiff also alleges that she was retaliated against by eBay and/or its employees.

6.      According to Plaintiff, the retaliation occurred after she complained about
Porter's conduct to Scott Newman, eBay's Vice President of Customer Support, on November
15, 2001.  *See id.* at 144:13-18 ("Q:  [D]id the retaliation all occur after you filed your charge
with the E.E.O.C in February of 2002?  A:  It started when I filed—when I filed that complaint to
Scott Newman [on November 15, 2001].").

7.      The specific conduct Plaintiff alleges was retaliatory on the part of eBay and/or its
employees is as follows:

7(a).    On December 21, 2001, Plaintiff was issued a written warning for
misusing her personal eBay trading account.  *See* December 21, 2001 Final Warning.  (A copy of
the Final Warning is attached hereto as Exhibit 13.)  Plaintiff received the warning because she
"bid on an item without" informing the seller that she was an eBay employee, which was against
company policy.  Kuczmanski Dep. (Ex. 1) at 136:22-23.  After the auction ended, the seller did
not send Plaintiff the merchandise she had ordered, and Plaintiff called the seller and "told him
[she] wanted [the] merchandise."  *Id.* at 137:10-11.  Plaintiff then sent the seller (an eBay
customer) "a nasty e-mail just saying, you know, 'I want my merchandise.  I'm an eBay
employee.'"  *See id.* at 137:13-15; *see also* e-mail from Plaintiff to Seller (accusing seller of
"fraud" and stating that he should have been "suspended [from eBay] a long time ago.")  (A copy
of the e-mail is attached hereto as Exhibit 14.)

       7(a)(i).       Although Plaintiff alleges that the warning she received for engaging in the above misconduct was retaliatory, she admits (1) that her conduct "violated eBay policy" in numerous ways, *see* Kuczmanski Depo. (Ex. 1) at 137-138 ("Q:  Did your conduct violate eBay policy?  A:  Yes. . . . Q:  Should you have sent the nasty e-mail?  A:  No."); and (2) that her conduct constituted a terminable offense. *See id.* at 141:13-16 ("Q:  Are you aware of any eBay employees who have been fired for this kind of misconduct with use of their—for misusing their eBay account?  A: Yes.").

       7(a)(ii).       Plaintiff also admits that she has no evidence whatsoever, other than her own speculation and conjecture, establishing that the above warning was retaliatory:

| | |
|---|---|
| Q: | Okay.  You alleged in your complaint, Ms. Thornton, that you believe that this final warning was retaliation for your reporting Mr. Porter's conduct to Scott Newman. |
| A: | Yes. |
| Q: | Why do you believe that it was retaliation for that? |
| A: | Because I don't—I think that Janet and Nita [who issued the warning] got in trouble, and they were really mad at me for reporting all of those problems to Scott Newman and going over their head . . . . |
| Q: | ***What facts do you have that support that belief?*** |
| A: | ***I don't have any facts.*** . . . |
| Q: | They didn't tell you they were angry? |

                                              \* \* \*

| | |
|---|---|
| A: | No. |
| Q: | They didn't tell you they were going to punish you somehow? |
| A: | No. |
| Q: | ***And so other than the fact that this occurred after you e-mailed Scott Newman, do you have any evidence that it was done in retaliation for your reporting to Scott Newman?*** |
| A: | ***It just seemed very coincidental.*** . . . |

*Id.* at 141:22-25;142:1-25 (emphasis added).

       7(b).    In addition to the above, Plaintiff alleges that eBay retaliated against her by giving her a "substandard" performance review for the year 2002. *See id.* at 146:1-7.

7(b)(i).        Plaintiff's performance review for the year 2002, like all similarly situated eBay employees, was based on the following categories:  (1) Quality (assisting eBay members with accurate and complete information to their questions); (2) Productivity (the average number of messages and searches handled per hour); (3) Attendance; (4) Working With Others; (5) Flexibility; and (6) Customer Focus.  *See* Plaintiff's 2002 Performance Review at 1-2.  (A copy of the 2002 Performance Review is attached hereto as Exhibit 15.)

7(b)(ii).       In the categories of Quality, Flexibility, and Customer Focus, Plaintiff received a rating of 3, which, as her performance review makes perfectly clear, is an "appropriate [rating] for the majority of the workforce," and means that Plaintiff "met[] and occasionally exceed[ed] eBay's high expectations." *Id.* at 3 (emphasis in original).

7(b)(iii).      However, Plaintiff argues in her answers to eBay's interrogatories that her Quality rating did not adequately reflect her actual performance because "in April 2002, QC [(Quality Control)] changed from a weighted scoring to an all or nothing (100% or 0%) scoring system."  Pl.'s Responses to Def.'s First Set of Interrogs. (Ex. 4), Response to Interrog. 9.  Plaintiff, however, ignores that this change was applied across the board at eBay, i.e., it affected all eBay employees in the same way, and therefore, Plaintiff was not treated differently than any other eBay employee in this regard.  *See* Kuczmanski Depo. (Ex. 1) at 282:4-6 ("Q:  Everyone on your team was subject to the same criteria, correct?  A:  Yes.").

7(b)(iv).       More importantly, Plaintiff admits in her deposition that her Quality was, in fact, "low" in 2002.  *Id.* at 303:14-15 ("I ***did*** have low productivity and low quality. . . " (emphasis added)).

7(b)(v).       In the category of Productivity, Plaintiff received a rating of 2, which meant that eBay's expectations "have not been fully achieved." 2002 Performance Review (Ex. 15) at 3.

7(b)(vi).       Although Plaintiff states that she was "disappointed" in this rating, she admits that Productivity is an "objective" criteria that is based on the average number of messages and searches handled per hour, *see* Kuczmanski Depo. (Ex. 1) at 146:1-25, 147:1, and therefore, there is nothing a supervisor could do to affect this rating, either positively or negatively. *See id.*

7(b)(vii).       More importantly, Plaintiff admits in her deposition that she did, in fact, "have low productivity" for the year 2002. *Id.* at 303:13-15 ("I ***did*** have low productivity. . . . " (emphasis added)).

7(b)(viii).       In the category of Attendance, Plaintiff received a rating of 1, which is "below an acceptable level." *See* Plaintiff's 2002 Performance Review (Ex. 15) at 1 & 4.   As her performance review makes clear, Plaintiff was given this rating due to 9 Attendance and 11 Adherence occurrences violations in 2002. *Id.* at 1.

7(b)(ix).       Like Productivity, Attendance/Adherence is an objective criteria, and Plaintiff has made no argument that these Attendance/Adherence occurrences were improperly recorded. *See* Pl.'s Responses to Def.'s First Set of Interrogs. (Ex. 4), Response to Interrog. 9 (omitting any allegation that Plaintiff was improperly allotted Attendance/Adherence occurrences); *see also* Pl.'s Compl. (Ex. 2) (same); *see also* Pl.'s Charge (Ex. 3) (same).

7(b)(x).       Moreover, Plaintiff's 2002 Performance Review has a section entitled "Employee Comments." *See* Plaintiff's 2002 Performance Review (Ex. 15) at 4. In this section, Plaintiff took the time to state that she was "disappointed with [her] review"

because she felt, albeit unjustifiably, that it did not reflect "[her] productivity and hard work ethic." *Id*. However, Plaintiff ***never*** stated that she was improperly allotted Attendance/Adherence occurrences. *See id*.

   7(b)(xi).  Finally, in the category of Working With Others, Plaintiff received a rating of 2 (expectations not fully met). *See id*. at 2.

   7(b)(xii).  This rating was due to the fact that Plaintiff had "some issues with her attitude displayed on the floor." *Id*. Specifically, Plaintiff's new supervisor, Brent Boutwell, reported that Plaintiff "consistently made comments about not wanting to work [at eBay], and about how she was recognized in Support [department] but not since she moved over [to her new department]." *Id*.

   7b(xiii).  On page 303 of her deposition, Plaintiff states that she did not make such comments. *See* Kuczmanski Depo. (Ex. 1) at 303:16-19. However, on page 301 of her deposition, Plaintiff admits that on one occasion she told Brent Boutwell that "it was difficult for [her] to come to work due to the lawsuit." *Id*. at 301:20-24. On page 302, Plaintiff states that she did, in fact, make such comments, but that they were made to Brent Boutwell in private. *Id*. at 302:5-11.

   7(b)(xiv).  Moreover, and perhaps most importantly, Plaintiff did ***not*** indicate in the "Employee Comments" section of the 2002 Performance Review, which she signed, that Brent Boutwell had made false or incorrect statements. *Id*. at 303:24-25;304:1.

   7(c).  Plaintiff alleges that after she complained to Scott Newman, certain supervisors, i.e., Janet Farson and Nita Call, "were very cold in their demeanor" to Plaintiff. *Id*. at 143:19-24. Apparently, when Call and Farson would hand out bonus checks, they would hand Plaintiff's check to her without saying "Good job." *Id*. at 143:24-25; 144:1-3.

7(d).   Plaintiff's supervisor, Brent Boutwell, allegedly "started keeping records in [Plaintiff's] personnel file about any little thing [Plaintiff] said or did.  If [Plaintiff] said, 'Oh, I don't like this policy,' he'd write it down."[5]  *Id.* at 147:4-8.

7(d)(i).   Plaintiff admits, however, that she has no evidence proving that the above conduct on the part of Brent Boutwell was retaliatory:

Q:   Anything else that you think constituted retaliation?
A:   . . . Brent Boutwell started keeping records in my personnel file about any little thing I said or did.  If I said, "Oh, I don't like this policy," he'd write it down.  You know, he didn't do that to other people.
Q:   *How do you know . . . whether he kept notes about other people or not? You never saw their files, did you?*
A:   *No.*
Q:   *So how do you know whether he kept notes on other people or not?*
A:   *I don't know.*

*Id.* at 147:2-21 (emphasis added).

7(e).   Plaintiff alleges that her supervisors allegedly "talked amongst themselves" about Plaintiff's complaints concerning Porter.  *Id.* at 148:2-9.

7(e)(i).   Plaintiff admits, however, that she has no evidence proving that the above conduct actually occurred, or that it was retaliatory:

Q:   Anything else you think that constituted retaliation?
A:   I just think that, you know, talking amongst supervisors, I was . . . viewed as a poor employee because of complaining about Chris Porter. . . .
Q:   *Did anyone ever tell [you] that [your supervisors] talked about [you] and your complaints?*
A:   *No.*
Q:   *Did any supervisor ever tell you that he or she had heard that you made these complaints?*
A:   *Not that I recall.*
                                    ***

Q:   *Okay. Did any of them – did anybody ever tell you the supervisors have heard that you make complaints?*
A:   *Not that I'm aware of.*

---

[5]   This statement is further evidence that Plaintiff did, in fact, make negative comments about working at eBay, like her supervisor Brent Boutwell reported.

*Id.* at 148:2-25; 149:1-4 (emphasis added).

        7(f).    Plaintiff alleges that her desk was moved into an area where she

was unfamiliar with her coworkers, making her feel "uncomfortable." *Id.* at 150:1-11.

        7(f)(i).    Plaintiff admits, however, that she has no evidence proving

that the above conduct was retaliatory:

> Q:    Any other evidence of retaliation by eBay . . . .
> A:    Yes. I was in investigations, and for – for an unknown reason, they
>        decided to move my desk . . . with a bunch of people who I didn't even
>        know . . . .
>
>                           \*\*\*
>
> Q:    Do you know who made the decision to move your desk?
> A:    No.
> Q:    Do you know why the decision was made to move your desk?
> A:    No . . . .
>
>                           \* \* \*
>
> Q:    ***Other than the mere fact that you were moved, do you have any evidence***
>        ***that it was done in retaliation for anything***?
> A:    ***I don't know what the motives were for moving me.***

*Id.* at 150:5-11; 151:1-6; 153:7-11 (emphasis added).

        7(f)(ii).    Plaintiff also failed to present any evidence that,

other than feeling uncomfortable, moving her desk affected her ability to do her job:

> Q:    Other than being upset, how did it affect your ability to do your job?
> A:    I don't feel like I performed as well.
> Q:    Why?
> A:    The girl that was sitting next to me told me – I told her that I was going to
>        move into that fifth desk, and she said she didn't really care for me and
>        didn't want me to move into that desk.  And so that already – that right
>        there gave me an uneasy feeling.  ***I didn't feel comfortable***.

*Id.* at 151:16-25 (emphasis added).

        8.    Plaintiff filed her Charge of Discrimination on February 11, 2002, three

months after the alleged retaliation began (as mentioned above, Plaintiff alleges that the

retaliation began when she complained to Scott Newman on November 15, 2001). *See* Charge (Ex. 3).

9.      However, Plaintiff's Charge did **not** assert a claim for retaliation; it contained no allegations of retaliation whatsoever. *See id.*

## IV.    Allegations Relevant To Plaintiff's Common Law Negligent Supervision Claim.

10.      Plaintiff alleges that eBay breached its "non delegable duty" by (1) failing to investigate "sexual harassment complaints"; by failing to reprimand individuals who were known to sexually harass female employees; and by generally failing to protect Plaintiff "from being subjected to continued sexual harassment." *See* Pl.'s Compl. (Ex. 2), at ¶¶ 122-129.

## V.    Allegations Relevant To Plaintiff's Assault Claims.

11.      Plaintiff alleges that she was assaulted by Porter, and that as a direct and proximate result of this assault, she "has been, and continues to be harmed, and sustain[] damages." *Id.* at ¶¶ 130-134.

12.      The specific conduct Plaintiff alleges constituted assault is as follows:

12(a).      Plaintiff alleges that in October of 2000, Porter allegedly yelled at her for telling a customer to call her back.  The details of this incident are discussed, *supra*, at paragraph 3(a).

12(b).      Plaintiff alleges that towards the end of April 2001, Porter yelled at her for failing to log into the log book.  The details of this incident are discussed, *supra*, at paragraph 3(d).

12(c).      Finally, on September 11, 2001, Plaintiff and another coworker were discussing the terrorist attack on the World Trade Center in New York City.  Porter allegedly overheard this conversation and stated to Plaintiff: "I have a 9mm gun, and I'm going to kill any

terrorist who steps foot on my property." *See* Kuczmanski Depo. (Ex. 1) at 84-86, *and* Pl.'s

Responses to Def.'s First Set of Interrogs. (Ex. 4), Response to Interrog. 13.  Plaintiff alleges that

she "took that as a direct threat." Kuczmanski Depo. (Ex. 1) at 85:5.  When asked why she took

the comment as a threat, Plaintiff stated:

> Q:   So why did you take his comment that he would shoot a terrorist as a personal threat?
> A:   Because people -- people associate Arabics or Middle Eastern people with being terrorists.
> Q:   What people?
> A:   I think the general public.
> Q:   And that's based on what?
> A:   Especially after 9/11.  Based on 9/11.
> Q:   ***And what evidence do you have that Mr. Porter thought that all Arabics were --all Arabs were terrorists?***
> A:   ***'Cause he made comments about having guns, and he was going to defend his home and --***
> Q:   ***And what does that have to do with Arabs being terrorists?***
> >  * * *
> A:   ***I think it was just a generalization he gave to all Arabic people.***
> >  * * *
> Q:   He didn't say he would shoot an Arab, did he?  He said he would shoot a terrorist.
> A:   ***Yeah, and most people associate Middle Eastern people with terrorism.***

*Id.* at 86-87 (emphasis added).

        12(c)(i).      Other than the above stereotypical generalization, Plaintiff

offers no other evidence to establish that the above "threat" was directed at her.  *Id.* at 87:19-22.

## STANDARD FOR SUMMARY JUDGMENT

      Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R. Civ. P. 56(c).  Although courts must construe all facts and reasonable inferences therefrom in

the light most favorable to the nonmoving party, "it is not enough that the nonmovant's evidence

be 'merely colorable' or anything short of 'significantly probative.'" *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir. 1992). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to overcome summary judgment]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In fact, "the movant need only point to those portions of the record which demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Comm. for First Amendment*, 962 F.2d at 1521. Once the moving party meets this burden, "the burden shifts to the Plaintiff[] to identify specific facts that show the existence of a genuine issue of material fact." *Id.* (citation omitted). The party moving for summary judgment "is not required to provide evidence negating an opponent's claim." *Young v. United Automobile Workers*, 95 F.3d 992, 996 (10th Cir. 1996) (citation and internal quotation marks omitted). "Rather, the burden is on the nonmovant, who must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* (citation and internal quotation marks omitted).

## ANALYSIS

### I.   Plaintiff Has Failed To Establish a Claim For Hostile Work Environment.

In *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986), the Supreme Court stated that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" (Citation omitted.) Moreover, the law is well-established that "[I]f the nature of an employee's environment, however unpleasant, is ***not due to her gender***, she has ***not*** been the victim of sex discrimination as a result of that environment." *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994) (emphasis added). As explained below, Plaintiff cannot prove that the

conduct of which she complains was directed at her because of her gender, *or* that it was

sufficiently severe or pervasive to alter the terms and conditions of her employment.

A.      The Undisputed Facts Prove That Porter Did Not Embarrass Plaintiff Because Of
        Her Gender, Nor Did He Single Out Women.

Plaintiff alleges that Porter embarrassed her by publicly reprimanding her, on two

occasions, for failing to comply with eBay work rules.  On the first occasion, Porter allegedly

publicly reprimanded Plaintiff for telling a customer to call her back.[6]  *See* Statement of Facts, ¶

3(b).  On the second occasion, Plaintiff alleges that Porter publicly reprimanded her for failing to

log into the log book.[7]  *See id.* at ¶ 3(d).  Neither of these incidences, however, are sufficient to

demonstrate that Plaintiff was subject to gender discrimination as a matter of law.

The Tenth Circuit has clearly stated that "[a]n employee's supervisor has the right to

express concern about [violation of company policy,] . . . [and that] Title VII . . . does not give a

woman immunity from being reprimanded in the presence of her co-workers if her supervisor

believes that she has violated work rules or has been negligent in performing her job."  *Gross v.*

*Burggraf Constr. Co.*, 53 F.3d 1531, 1545-1546 (10th Cir. 1995).[8]  This is clearly the case here.

Indeed, in both of the incidences described above, it is undisputed that Porter was

reprimanding Plaintiff not simply to embarrass her, but rather because Plaintiff violated work

rules; indeed, Plaintiff admits as much.  *See* Kuczmanski Depo. (Ex. 1) at 67:22-25 ("Q: Okay.

So your understanding at that point was that he was yelling at you so that other people would

---

[6]        As explained below in Section I.D.2, *infra*, Plaintiff did not report this incident to anyone at
eBay's Human Resources department or to eBay's management.  Thus, this allegation cannot form the basis of
Plaintiff's sexual harassment claim.
[7]        As explained below in Section I.D.3, *infra*, Plaintiff reported this incident to eBay's Human
Resources department, and eBay then took prompt and effective action to remedy the problem, and did, in fact,
remedy the problem.
[8]        *See also Paape v. Wall Data, Inc.*, 934 F.Supp. 969, 977 (N.D.Ill.1996) ("Title VII's focus on
sexually discriminatory conduct does not operate as a general ban on yelling, swearing, screaming and other rude or
offensive behavior." (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir.1987)).

comply with the rules regarding the logbook?  A:  Yes."); *see also id.* at 33 (stating that Porter

yelled at her for telling a customer "to call back to see if his problem was solved.").  Moreover,

*nowhere* in her deposition, her Complaint, or her answers to eBay's Interrogatories, has Plaintiff

alleged that Porter yelled at her because she was a woman, or that Porter singled out women.  To

the contrary, Plaintiff explicitly states in her November 15, 2001 complaint to Scott Newman

that "On numerous occasions, [Porter] has embarrassed team members, ***both men and women***, in

front of the team."  *See* Supervisor Evaluation (Ex. 11) at 2 (emphasis added).[9]  Finally, it is

undisputed that, although Porter did yell at Plaintiff for violating work rules, he did ***not*** use a

gender based vulgar term in referring to Plaintiff, and he did ***not*** threaten Plaintiff with physical

violence.  Indeed, Plaintiff has failed to even allege such facts.  *See* Statement of Facts, ¶¶ 3(a) &

3(d).

     Under these undisputed facts, and pursuant to *Gross*, no reasonable juror could conclude

that Porter publicly reprimanded Plaintiff *because she is a woman*.  To the contrary, the

undisputed facts unequivocally prove that Porter was an equal opportunity yeller.  Accordingly,

while his conduct may have been insensitive and rude, it did not violate Title VII.

     B.     Although Plaintiff Alleges That Porter Used Demeaning Terms, the Terms Were
            Gender Neutral, and Were Not Directed At Plaintiff Because Of Her Gender.

     Plaintiff also alleges that Porter said Plaintiff "asks stupid questions"; that when

confronting Porter with a question, he would respond, "that's my name don't wear it out"; that he

made derogatory remarks about Plaintiff's attempt to obtain a master's degree; and that he

denied Plaintiff's request for overtime because there were others with 'family needs."

---

[9]     In fact, Plaintiff alleges that she talked to one of her co-worker's about Porter's behavior, and she
said: "Don't worry about it.  He's just an asshole like that, and he yells at everyone."  *See* Kuczmanski Depo. (Ex.
1) at 36:13-16.

On their face, comments such as "you ask stupid questions," or "that's my name don't wear it out" are gender neutral.  Moreover, Plaintiff's own testimony clearly establishes that Porter used harsh language in dealing with all of his subordinates, male and female.  *See* Supervisor Evaluation (Ex. 11) at 2 ("Chris not only intimidates ***members*** from asking questions, his comments and responses are equally degrading.  He told ***us*** not to ask him questions, and referenced ***our*** questions to Nicole. . . .  He continued to make inappropriate remarks to me ***and other team members.***" (emphasis added)).

Likewise, Porter's comment that eBay would not "hire people who are going to college because, you know, ***they expect a big time commitment from their supervisors***, and someone like you, they wouldn't hire you ***because you're getting a master's degree***," and his comment that he would "only giv[e] overtime to people with ***family needs***," have nothing to do with Plaintiff's gender.  Indeed, Plaintiff admits as much:

> A:    And he said, "Well, they don't want to hire people who are going to college because, you know, ***they expect a big time commitment from their supervisors***, and someone like you, they wouldn't hire you ***because you're getting a master's degree***."
> Q:    And his comment was that because you were in school--
> A:    A woman and getting a master's degree. . . . They're not going to hire a woman who's in school getting a master's degree.
> Q:    ***But the reasons he gave was that you needed to make a bigger time commitment to the company?***
> A:    ***Yes. . . .***

*Id.* at 97:16-25;98:1-8 (emphasis added).[10]

Accordingly, none of the above comments are sufficient to demonstrate that Plaintiff was subjected to gender discrimination as a matter of law.

---

[10]    Porter's comment that he would only give overtime to people with "family needs," like many of the above comments, has nothing whatsoever to do with Plaintiff's gender.  Indeed, Plaintiff actually admits that it was women who were benefiting from Porter's actions regarding overtime.  Kuczmanski Depo. (Ex. 1) at 72:3-25.

C.    Plaintiff's "Eleventh Hour" Allegations Of Improper Sexual Comments Were Not Even Directed At Her, and Are Not Severe and Pervasive Enough To Create a Hostile Work Environment.

In addition to the above obviously gender-neutral comments and actions, Plaintiff alleges in her deposition that Porter "talked about sex and S and M"; that he referred to women as "eye candy"; and that he talked about people's "tits and ass."[11]  These comments, however, as Plaintiff admits, were generalized comments that were not even directed at her.[12]   Because they were not directed at her, they cannot form the basis of her sexual harassment claim.  *See, e.g.,* *Smith v. Ashland, Inc.*, 179 F. Supp. 2d 1065, 1070 (D. Minn. 2000) (Discharged employee failed to allege conduct sufficiently severe or pervasive to constitute actionable sexual harassment in action against her former employer, although alleged sexual banter at employer's facility may have been tasteless and inappropriate, where sexual comments were not directed at her, but were merely uttered in her presence)[13]; *Spencer v. Commonwealth Edison Co.*, 1999 WL 14486, *9

---

[11]    When Plaintiff complained to Juli Adams in June of 2001 that Porter had yelled at her, she made no mention of the fact that Porter "talked about sex and S and M"; that he referred to women as "eye candy"; that he talked about people's "tits and ass"; or that he told Plaintiff she had "sexy legs."  When Plaintiff complained to Adams in October of 2001 that Porter said "she could date women," she again made no mention of the above sexual comments.  And, when Plaintiff submitted a written complaint to Scott Newman in November of 2001, she again failed to mention any of the above alleged sexual comments.  Moreover, Plaintiff's Complaint is devoid of any allegations that Porter made inappropriate sexual comments.  *See* Pl.'s Compl. (Ex. 2).  Plaintiff's Charge of Discrimination is also devoid of any such allegations.  *See* Pl.'s Charge (Ex. 3).  So are her answers to eBay's interrogatories.  *See* Pl.'s Answers (Ex. 4).   Indeed, Plaintiff did not mention that Porter had made sexual comments until her deposition was taken in August of 2003, almost a year after her Complaint was filed.  Accordingly, Plaintiff's allegations of sexual comments are inherently unreliable and contradictory.  Thus, they should be disregarded by the Court.  *See, e.g., Asa-Brandt, Inc. v. ADM Investor Servs., Inc.*, 138 F. Supp. 2d 1144, 1161 (N.D. Iowa 2001) ("[A]n affidavit inherently contradicting the prior deposition testimony of the affiant and containing no explanation or clarification for the disparity fails to generate a genuine issue of fact."); *Olin v. Disneyland International*, 832 F. Supp 1342, 1345 (D. Ariz. 1993) ("[P]laintiff could not use contradictory testimony to defeat a motion for summary judgment. . . .").

[12]    *See* Kuczmanski Depo. (Ex. 1) at 41:8-23 (". . . he was constantly talking about sex, . . . *and him and another girl at work would talk about that*. . . .  Q: Who was the other person with whom he was engaging in these conversations?  A: Rebecca Thomas, and sometimes some of the other girls would hear and make comments about it."); *see also id.* at 46:16-22 ("Q: Okay.  And when these comments were made, were they sort of made generally so that anyone [on your team] could hear them.  A: Yes."); *see also id.* at 43:13 (stating that Plaintiff "didn't pay very much attention" to the above alleged conversations.").

[13]    The facts of *Smith* are remarkably similar to the facts presented here.

(N.D.Ill. Jan. 6. 1999) ("[B]ecause the conduct was not directed at plaintiff she has no claim for sexual harassment.").

Plaintiff does allege that Porter made some inappropriate sexual comments directly to her. Specifically, Plaintiff alleges that on one occasion Porter stated that she "could date women." On another occasion, Porter allegedly stated that Plaintiff had "sexy legs." These isolated comments, however, even when combined with the above comments which were not even directed at Plaintiff, are not sufficiently severe and pervasive to create an ***objectively*** hostile work environment as a mater of law.[14] Numerous federal courts have reached this conclusion, as a matter of law, under similar circumstances. *See, e.g., Rennie v. Dalton*, 3 F.3d 1100, 1106-07 (7th Cir.1993) (holding that off-color jokes and a conversation about a strip bar not directed at the employee were insufficient to establish liability), *cert. denied*, 510 U.S. 1111 (1994); *Schweitzer-Reschke v. Avnet, Inc.*, 874 F. Supp. 1187, 1193 (D. Kan. 1995) (holding conduct, including the following, did not create a hostile environment: graphic inquiries into the plaintiff's sex life; suggestions that she wear a shorter skirt, and do "what she had to do" to obtain favorable business); *Ballou v. University of Kansas Med. Ctr.*, 871 F. Supp. 1384, 1388-90 (D. Kan. 1994) (holding the following conduct by supervisor did not amount to sexual harassment from the objective standpoint: asking plaintiff about her interest in a romantic relationship; asking her to kiss him on her birthday; locating her work station in an area where he passed by 30-40 times daily; often talking with her, sitting on her desk, leaning close to her, frequently staring at her, following her, insisting she go outside on breaks, and often inviting himself to lunch with her).

---

[14] The Supreme Court has clearly stated that the environment must reveal conduct extreme enough "to amount to a change in terms and conditions of employment." *Faragher*, 524 U.S. at 775. Such a test ensures that Title VII does not become a general civility code. *See id.*

For the foregoing reasons, Plaintiff has failed to establish a hostile work environment as a matter of law.

      D.      <u>Even If Plaintiff Has Established a Hostile Work Environment, eBay Cannot Be Held Vicariously Liable Under the *Faragher-Ellerth* Defense.</u>

In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), the United States Supreme Court held that an employer is not vicariously liable for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee when:

> (a) [] the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) [] the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, 524 U.S. at 765. The undisputed facts clearly establish that the *Faragher-Ellerth* affirmative defense is applicable here.

          *1.*     *eBay Exercised Reasonable Care By Having a Comprehensive Sexual Harassment Policy In Place During the Relevant Time Period.*

The undisputed facts clearly establish that eBay exercised reasonable care by having a comprehensive anti-harassment policy in place prohibiting sexual harassment and identifying *several* different individuals to whom complaints could be addressed. *See* Employee Handbook, Section 4.4. (A copy of eBay's anti-harassment policy is attached hereto as Exhibit 16.) Section 4.4 of eBay's U.S. Employee Handbook—Fair Employment Policies, Harassment-Free Workplace Policy—specifically states that eBay is committed to providing a work environment that is free of unlawful discrimination, including sexual harassment, and that any employee who believes they have been harassed should immediately report the facts to any of the following individuals: "manager, Human Resources, the Legal Department or a management

representative." The Policy also states that retaliation is strictly prohibited, and that any report of sexual harassment will be immediately investigated. *See id.*

It is also undisputed that Plaintiff was aware of eBay's sexual harassment policy. Plaintiff specifically testified in her deposition that she "looked on the eBay [sexual harassment] policies to see what [she] should do [regarding Porter's alleged sexual harassment]," *see* Kuczmanski Depo. (Ex. 1) at 176:6-7; that she understood the policy to prohibit discrimination based on "race, gender, religion," *id*. at 177:6-9; that she understood that if she had "a problem, [she] can go and talk to a supervisor [or] manager," *id*. at 178:4-5; and that she understood she could report discrimination "without fear of retaliation." *Id.* Indeed, Plaintiff clearly stated that she understood that "if someone was harassing [her] at work, that [eBay] would investigate it and take the appropriate action." *Id.* at 178:20-23.

Because it is undisputed that eBay had a published anti-harassment policy, and that Plaintiff knew about and actually accessed and read the Policy on more than one occasion, the first element of the *Faragher-Ellerth* defense is established as a matter of law. *See Faragher*, 524 U.S. at 807-808.

> 2.   *Plaintiff Unreasonably Failed To Take Advantage Of the Avenues Of Redress Because She Never Complained About the Alleged Sexual Harassment.*

Plaintiff admits that she never complained to a manager, Human Resources, or the Legal Department about the alleged improper sexual comments. In fact, Plaintiff admits that, with regard to many of her allegations of improper sexual comments, she failed to even complain about the comments to the alleged perpetrator—Porter:

Q:   What's the first incident that you recall that you would characterize as verbal abuse by Mr. Porter?
A:   [Plaintiff describes how, in October 2000, Porter publicly reprimanded and embarrassed her for telling a customer to call her back.]

\* \* \*

Q:   *Did you ever report Mr. Porter's conduct that day to anyone at eBay?*
A:   *No, I did not.*[15]

\* \* \*

A:   About that time, he was constantly talking about sex, constantly talking
     about S and M and bondage and whips and chains, and him an another girl
     at work would talk about that, . . . .

\* \* \*

Q:   *Did you report it to anyone else at eBay [(other than coworkers)]?*
A:   *No.*[16]

\* \* \*

Q:   Okay. Have you told me basically everything you can recall about his
     comments regarding sexual matters while you were working under his
     supervision?
A:   No. . . . Do you want me to go on?
Q:   Yeah.
A:   He would consistently refer to women as eye candy. . . . He would always
     talk, you know, he would talk about tits and people's ass. You know, he
     would make comments to me about my legs and how sexy my legs
     were . . . .
Q:   *Did you complain to anyone – well, first of all, did you complain to*
     *[Porter] about his conduct in this regard. . . .*
A.   *No, but I complained to fellow coworkers.*

\* \* \*

Q:   *And you didn't complain to anyone else at eBay about it?*
A:   *No.*[17]

\* \* \*

A:   [T]hen he moved me to a desk completely isolated from the rest of the
     team.

\* \* \*

Q:   Did you complain to anyone about you desk being moved?
A:   Yeah. . . . [coworkers.]
Q:   *Anyone –anyone else?*
A:   *No.*[18]

\* \* \*

Q:   What was – what was the next example of improper conduct by Mr.
     Porter?
A:   Well, summertime started to come around, and I was wearing shorts, and
     he commented on my legs.

---

[15]   Kuczmanski Depo. (Ex. 1) at 31:8-25; 32:1-11; 35:24-25; 36:1 (emphasis added).
[16]   Kuczmanski Depo. (Ex. 1) at 41:8-11; 45:10-11 (emphasis added).
[17]   Kuczmanski Depo. (Ex. 1) at 48:5-25; 49:1-3; 49:25; 50:1-4; 51:8-10 (emphasis added).
[18]   Kuczmanski Depo. (Ex. 1) at 52:5-7; 54:7-15 (emphasis added). Although Plaintiff alleges that
Porter moved her desk to an isolated area, she admits later in her deposition that (1) she actually doesn't know if
Porter even had the authority to move her desk; and (2) that she actually doesn't know who made the decision to
move her desk. *See id.* at 54:1-6.

Q:      What did he say?
A:      "Your legs look sexy. . . ."

                                * * *

Q:      **Did you report that comment to anyone**?
A:      *No*. . .   He was always eyeing me, you know, like undressing me with he
        eyes, that type of thing. . . .

                                * * *

Q:      **Did you ever talk to [Porter] about his looking at you**?
A:      *No*. . . .

                                * * *

Q:      **Okay.  So you never talked to Mr. Porter about him looking at you in a
        way that made you uncomfortable.  Did you ever talk to anyone else at
        eBay about it.**
A:      **Just my coworkers.**[19]
Q:      . . . What other conduct do you believe by Mr. Porter was inappropriate?

                                * * *

A:      . . . [He] said I was stupid and I had no common sense.

                                * * *

Q:      **Okay.  Did you complain to anyone in H.R. or anyone else in eBay
        management about this incident**?
A:      **Not that I recall.**[20]
Q:      What's the next example of Mr. Porter's improper conduct?
A:      [He would say things like], "I'm going to go pinch a loaf" [or,] . . . . "I'm
        going to see a man about a horse or going to the John."

                                * * *

Q:      **Did you ever complain or talk to Mr. Porter about these kinds of
        comments**?
A:      *No*. . . .
Q:      Did you talk to anyone else at eBay about it?
A:      Just my coworkers.[21]

                                * * *

A:      [Plaintiff then describes how Porter "Talks to her chest"]
Q:      **Once again, you never talked to him about this, correct**?
A:      **Correct.** . . .

                                * * *

Q:      **And you never went to anyone in HR or eBay management about that
        issue either, did you**?
A:      **No.** . . .[22]

                                * * *

A:      And he said, "You know, . . . they don't want to hire people who

---

[19]    Kuczmanski Depo. (Ex. 1) at 74-75; 76:7-9; 78:2-6 (emphasis added).
[20]    Kuczmanski Depo. (Ex. 1) at 78:7-8; 79-81; 81:3-5 (emphasis added).
[21]    Kuczmanski Depo. (Ex. 1) at 81:9-21; 82:18-25; 83:1-8 (emphasis added).
[22]    Kuczmanski Depo. (Ex. 1) at 106-107 (emphasis added).

are going to college because, you know, they expect a big time commitment from their supervisors, and someone like you, they wouldn't hire you because you're getting a master's degree."

\* \* \*

Q:   ***Okay. Did you report to anyone in eBay management or H.R. about this comment that he made about your schooling?***

A.   ***No.***

Q:   Any of these comments that he made about your schooling?

A:   ***(The witness shook her head from side to side.)***[23]

In sum, based on Plaintiff's own deposition testimony, it is undisputed that Plaintiff unreasonably failed to take advantage of the avenues of redress with regard to her allegations of sexually inappropriate comments/behavior, because she never complained about the above incidences to a manager, Human Resources, or the Legal Department.[24]  Because Plaintiff failed to bring these incidences to eBay's attention, they cannot form the basis of her sex discrimination claim as a matter of law under *Faragher* and *Ellerth*.[25]

   3.   *When Plaintiff Did Complain About Alleged Improper Conduct, eBay Took Prompt and Effective Remedial Action.*

As explained in the statement of facts, *supra*, Plaintiff did complain to eBay management and/or Human Resources on four occasions about alleged improper conduct.  While Plaintiff alleges that she complained of a number of instances which she characterizes as discriminatory, virtually all of these incidences lack an explicit sexual or gender-based component, and thus

---

[23]   Kuczmanski Depo. (Ex. 1) at 97:9-20; 99:14-21.  Moreover, Plaintiff admits that the above comment involved her schooling, ***not her gender***: "Q: And his comment was that because you were in school-- A: A woman and getting a master's degree. . . . They're not going to hire a woman who's in school getting a master's degree.  Q: ***But the reasons he gave was that you needed to make a bigger time commitment to the company?*** A: Yes . . . ." *Id.* at 97:21-25; 98:1-8 (emphasis added).

[24]   *See generally* Kuczmanski Depo. (Ex. 1) at 180:9-15 ("Q: I think you testified that you ***never*** reported to anyone at H.R. or eBay management about Mr. Porter's sexual comments.  A: . . . Yes." (emphasis added)).

[25]   It should be noted that the record clearly demonstrates that when Plaintiff felt aggrieved, she did not hesitate to "marched right down to H.R. and report[]" the offending conduct to eBay's Human Resources Department.  Indeed, Plaintiff was even brazen enough to bypass Human Resources and complain directly to eBay's Vice President of Customer Support, Scott Newman.  As explained below, none of her complaints involved an explicit sexual or gender-based component.

informing eBay of them would not put eBay on notice of any sexual harassment.[26]  Regardless,

the undisputed facts clearly establish that, upon receiving Plaintiff's complaints, eBay took

prompt and effective remedial action with respect to each one.

> i.    eBay Took Prompt and Effective Remedial Action Regarding
>        Plaintiff's Complaint That Porter Yelled At Her Publicly For
>        Failing to Log Into the Log Book.

Plaintiff alleges that she complained to Juli Adams, eBay's Human Resources

Coordinator, that Porter had yelled at her in front of other coworkers for failing to log into the

logbook.  Immediately after receiving this complaint, Adams instructed Nita Call, Porter's

manager, that the situation needed to be addressed with Porter.  In accordance with Adams'

instructions, Call and another manager, Janet Farson, discussed the incident with Porter and gave

him a verbal warning, instructing him to "take all sensitive matters into a conference room," and

to "treat all team members with respect."  *See* Statement of Facts at ¶ 3(d).

In addition to receiving a verbal warning, Porter meet with Plaintiff and another coworker

the same day in an attempt to resolve the dispute.  In the meeting, Plaintiff told Porter that she

"didn't appreciate him yelling at [her] in front of other people and that it was really

humiliating. . . ."  Porter stated: "Well, you know, you're a good worker, and you're really smart

and independent, and, you know, I'd like my daughter to grow up to be someone like you."

Porter then stated that "he wouldn't do it again."  As a result of the meeting, Nita Call reported

that "Chris ha[d] apologized to Jeana and they seem to have worked out any difficulties

concerning the log in book."  *See id.*

Moreover, in Porter's 2001 Performance Review, it was specifically stated that Porter

"has had some challenges this past year with a couple of team members"; that "inappropriate

---

[26]    *See, e.g., Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 250 (2d Cir. 1995) (where complainant did not inform employer of sexual connotations of fellow employee's behavior, "there is no reasonable basis for the inference that [the employer] had either actual or constructive notice of the ongoing harassment.").

comments were overheard as well as prefaced to an individual [Plaintiff] who took exception to

this behavior"; and that Porter "was verbally warned regarding his professionalism"; but that

eBay "had seen growing improvement in these areas since his Verbal Warning regarding such."

Porter received "below acceptable level" or "expectations not fully met" ratings in the following

assessment categories: Leadership/Dependability; Working With Others; and Hire and Retain

Good People.  As a result, Porter's raise was significantly less than it had been in 2000.  *See id.*

> ii.     eBay Took Prompt and Effective Remedial Action Regarding
>          Plaintiff's Complaint That Porter Told Her That "She Could Date
>          Women."

Plaintiff alleges that she complained to Juli Adams, eBay's Human Resources

Coordinator, that Porter said: "You know, you can always date women."  However, the

undisputed facts clearly establish that, immediately after receiving this complaint from Plaintiff,

Adams met with Porter's manager, Nita Call, and told Call that the situation needed to be

addressed with Porter promptly.  In accordance with Adams' instructions, Call met with Porter

the same day, and informed Porter that Plaintiff was upset about the conversation that had taken

place, and counseled Porter to keep his comments professional and limited to work related

matters.[27]  Moreover, the above incident was referenced in Porter's yearly evaluation, and as a

result, Porter was given a significantly reduced raise, and received "below acceptable level" or

"expectations not fully met" ratings in the following assessment categories:

Leadership/Dependability; Working With Others; and Hire and Retain Good People.  *See*

Statement of Facts at ¶ 3(h).

---

[27]     Call's investigation revealed that Porter's "comment had nothing to do with [Plaintiff's] sexual
preference, but was just a comment that she could go [to the party] with a girl."  *See* Nita Call's October 23, 2001
Report (Ex. 10) ("As soon as I was informed of this incident [by Adams], I met with [Porter]. . . . [Porter] explained
that the group was talking about finding dates and joking about the party . . . [and that] his comment had noting to
do with [Plaintiff's] sexual preference, but was just a comment that she could go with a girl.").

      iii.    eBay Took Prompt and Effective Remedial Action Regarding Plaintiff's Complaint That Porter "Would Come Around Her Desk."

Plaintiff alleges that she complained to Jeff Anderson that Porter would "come around her desk" and "stop and talk with the person next to" her. The undisputed facts clearly establish that Anderson promptly investigated the alleged misconduct, including investigating at least three witnesses, each of whom stated that they had *not* witnessed Porter lingering around Plaintiff's desk. However, despite the fact that all of the alleged witnesses stated that Porter would only pass through to say "hi," Anderson expressly coached Porter "just to try to avoid any further problems between the two individuals." *See* Statement of Facts at ¶ 3(j).

      iv.    eBay Took Prompt and Effective Remedial Action After Plaintiff Complained To Scott Newman.

On November 15, 2001, Plaintiff complained to Scott Newman, eBay's Vice President, about Porter generally. The undisputed facts clearly establish that, after receiving the complaint, Newman immediately responded to Plaintiff and told her that he would "follow up"; that he met with Plaintiff in a conference room the same day and told her he was "sorry"; that he asked Human Resources for information concerning the allegations; that Human Resources told him that Porter had already been counseled for the alleged misconduct, and that there had been "no other instances or complaints brought to [their] attention"; and that Human Resources then met with Plaintiff and told her that Porter had already been counseled for the alleged misconduct, and that he "had been put on some kind of plan, like action plan." *See* Statement of Facts at ¶ 3(I).

The law is well-settled that "[t]he employer need not take all possible methods to remedy harassment . . . , rather, the remedial action must be reasonably likely to prevent the misconduct from recurring." *Hansen v. Perry Technologies*, 206 F. Supp. 2d 1223, 1236 (S.D. Fla. 2002); *see also Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp. 2d 1314, 1327 (M.D. Fla. 2002). Here,

not only were eBay's actions reasonably likely to prevent the conduct *complained of* from

recurring, they in fact *did* correct the conduct complained of from recurring. Indeed, after eBay

reprimanded Porter for yelling at Plaintiff publicly, Plaintiff *never* reported another incident

where Porter yelled at her publicly, or privately[28]; after eBay reprimanded Porter for making a

comment to Plaintiff about "dating women," Plaintiff *never* reported another incidence where

Porter made an inappropriate personal comment; and after eBay reprimanded Porter for "coming

around Plaintiff's desk," Plaintiff admits that Porter "quit coming down as frequently." Because

the undisputed facts clearly establish that eBay took prompt and effective action to remedy *every*

allegation of improper conduct that Plaintiff complained of, eBay cannot be held vicariously

liable for Porter's conduct pursuant to *Faragher* and *Ellerth,* even if it was on notice of ongoing

sexual harassment, and, as discussed above, it was not.[29]

## II.      Plaintiff Has Failed To Establish a Claim For Disparate Treatment.

### A.      Plaintiff Cannot Prove That eBay Discriminated Against Her By Refusing Her Requests For Promotions.

In addition to asserting a claim for sexual harassment, Plaintiff arguably also asserts a

claim for disparate treatment. Apparently, Plaintiff alleges that eBay discriminated against her

on the basis of her gender, in violation of Title VII, by refusing to promote or transfer her to any

of the positions to which she applied. Disparate treatment claims, like Plaintiff's here, are

---

[28]      *See* Porter Depo. (Ex. 5) at 169:25:170:1-12 ("Q: Okay. Did they [(eBay)] direct you to cease this sort of conduct in the future? A: Yes. Q: Did you, in fact, cease this conduct? A: Yes. Q: Never had any other incidents of yelling after this-- * * * A: Never had any incidents to where I have raise[d] my voice inappropriately.").

[29]      Plaintiff argues that, although eBay took prompt and effective action, in some instances eBay did not report to her the exact discipline taken against Porter. Numerous courts, however, have held that failing to report to an employee the exact discipline taken to correct improper conduct does "not preclude[] [the employer] from asserting its affirmative defense." *Lawrence v. Wal-Mart Stores, Inc.* 236 F. Supp. 2d 1314, 1328 (M.D. Fla. 2002). Indeed, in *Lawrence,* the Court stated: "Defendant's failure to fully inform Plaintiff and failure to implement internal policies to the letter neither prevents Defendant from affirmatively defending itself, nor undoes Defendant's prompt corrective action. Just as the Eleventh Circuit announced it would not sit as a super-personnel department . . . , this Court also will not reexamine how Defendant's management chose to implement its internal policies." *See id.*

analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, Plaintiff must carry the initial burden of establishing a prima facie case of discrimination. This can only be done by showing: "(i) that [s]he belongs to a [protected class]; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [s]he was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of ***complainant's qualifications***," i.e., that the applicant eventually selected for the position was similarly situated to Plaintiff. *Id.* at 802 (emphasis added).

For purposes of summary judgment, eBay does not dispute that Plaintiff applied for numerous positions, or that many of her applications were rejected. However, Plaintiff has utterly failed to establish the fourth element of a prima facie claim for disparate treatment. Indeed, although Plaintiff complains that she was not selected for certain positions, she admits that she has no information whatsoever regarding whether she was qualified for the positions; who eBay actually hired for the positions to which she applied (including whether they were male or female); and/or that she has no knowledge or information regarding the selected applicants' qualifications and experience:

> Q:   Okay, I want to kind of . . . just go down this list [of the positions you applied for] and talk a little bit about each of these positions. With respect to the supervisor, customer support position on Page 5 of 7, do you know who got that position?
> A:   *No.*
> Q:   With respect to the senior customer support representative for the graveyard shift, do you know who got that position?
> A:   *No.*
> Q:   With respect to the supervisor for customer support for graves on the bottom of Page 5 of 7, do you know who got that position?
> A:   *No.*
> Q:   Moving on to Page 6 . . . there's an entry for senior customer support representative. Do you know who got that position?
> A:   *No.*

Q:     Supervisor customer support, dash, fraud prevention.  Do you know who
       got that position?
A:     *No.*
Q:     Senior customer support representative.  Do you know who got that
       position?
A:     *No.*
Q:     Senior customer support representative lead.  Do you know who got that
       position?
A:     *No.*
Q:     Supervisor of customer support.  Do you know who got that position?
A:     *No.*
Q:     . . . Customer support specialist.  Do you know who got that position?
A:     *No.*
Q:     And customer support specialist.  Do you know who got that position?
A:     *No.*
Q:     Are there other C.S.R. positions you think you applied for that aren't on
       this list?
A:     *No.*
Q:     Okay.  There's a marketing position that you think you applied for that's
       not on this list?
A:     Yes.
Q:     Okay. And do you know who got that position?
A:     ***They closed the position and didn't fill it.***
Q:     Okay.  Are there any other positions that you can think of for which you
       applied?
A:     Yes.
Q:     And what's that?
A:     . . . database developer.

                              * * *

Q:     Do you know who got the position?
A:     Yes.
Q:     Who got it?
A:     Garrett Seeble.

                              * * *

Q:     What were the qualifications for the . . . database developer position . . . .
A:     Bachelor's degree preferred, experience working with databases,
       knowledge of Visual Basic, able to read and generate reports.
Q:     What—do you know what Mr. Seeble's position was when he applied. . . .
A:     ***I don't.***
Q:     Do you know anything about his knowledge of Visual Basic?
A:     ***I don't.***
Q:     Do you know anything about his ability to read and generate reports?
A:     ***I don't.***
Q:     Do you know anything about his experience working with databases?
A:     ***I don't.***

Q:    Okay. Any other positions you can think of that you applied for that we
      haven't talked about today or yesterday?
                                    * * *
A:    . . . The Community Watch Department.
                                    * * *
Q:    Do you know who got the position?
A:    *I don't*.
Q:    Any other positions that you recall for which you applied?
A:    No. Actually, yes. . . . an e-watch position.
                                    * * *
Q:    Do you know who got the position?
A:    *No*.
                                    * * *
Q:    Anything else.  Any other positions?
A:    No.[30]

In the absence of ***any*** evidence, or even allegations, regarding who was selected for the

above positions, or regarding their experience and qualifications, Plaintiff cannot prove the

fourth element of a prima facie claim of disparate treatment.  Indeed, Plaintiff cannot prove that

after she was rejected for the above positions, the positions remained open and eBay continued to

seek applicants from persons of ***"complainant's qualifications,"*** i.e., from applicants who were

similarly situated.  In light of the paucity of evidentiary support for Plaintiff's disparate treatment

claim, it is apparent that her claim is based entirely on Plaintiff's own speculation and

conjecture.  Consequently, Plaintiff's disparate treatment claim must be dismissed as a matter of

law.[31]

---

[30]    Kuczmanski Depo. (Ex. 1) at 306-312 (emphasis added).  Plaintiff also alleges that she applied
for, and was denied, certain lateral transfers.  However, like the above promotional requests, Plaintiff admits that she
does not know who was selected for the transfers, and/or that she has no information regarding their qualifications
and levels of experience. *See id.* at 119:13-14; 120:11-14; 123-127.
[31]    To the extent that Plaintiff also argues that the denial of the above promotions was retaliatory (and
it is not clear that she does), such a claim would directly conflict with Plaintiff's statement that the retaliation did not
begin until November 15, 2001, as most of Plaintiff's applications for promotions were submitted and rejected
*before* November 15, 2001.  Regardless, any claim that the denial of the above promotions was retaliatory also fails
because plaintiff, as set forth above, has no evidence whatsoever to prove (1) whether she was even qualified for the
promotions; (2) who denied the promotions (although it is undisputed that it was not Chris Porter); (3) whether the
person who denied her promotions was aware of her complaints; (4) who was actually selected for the position for
which she applied; and (5) that she was more (or equally) qualified than the selected applicant.  Plaintiff simply

B.     Plaintiff Cannot Prove That eBay Discriminated Against Her By Refusing Her
       Request For Overtime.

To the extent that Plaintiff also alleges that eBay discriminated against her, in violation of

Title VII, by refusing a request for overtime, this claim must also fail as a matter of law.

Plaintiff alleges that on **_one_** occasion she requested overtime from Porter and Porter stated: "Oh,

no. I'm only giving overtime to people with **_family needs_**. You're single, and you don't need

overtime." Kuczmanski Depo. (Ex. 1) at 68:21-24 (emphasis added). Plaintiff alleges that

Porter selected two women—"Vicky," who was married and whose husband had been laid off,

and Ardis Weight, who was newly married—for overtime rather than her. *Id.* at 72:5-25. It is

undisputed, however, that Plaintiff's request for overtime was not denied, as Plaintiff alleges.

Indeed, Plaintiff admits that after she "complained to management, [Porter] offered [her] four

hours – four to six hours overtime at the end of the day." *Id.* at 73:5-8. Plaintiff, however,

declined his offer because she "had already made plans for the weekend." *Id.* at 70:5-9.

Therefore, Plaintiff cannot prove that she suffered disparate treatment.

However, regardless of whether Plaintiff was actually denied overtime, it is clear that

Plaintiff is alleging that as an unmarried person without family needs, she has fallen victim to an

adverse employment action. Such a claim is not actionable under Title VII as a matter of law.

Unmarried persons without family needs are simply not a protected class for purposes of

discrimination analysis under Title VII, or any other federal or state statute. *See* 42 U.S.C. §

2000e-2(a)(1) (prohibiting discrimination based on race, color, religion, sex, and national origin).

And, Plaintiff does not allege that the overtime policy described above had a disparate **_impact_** on

a protected class, i.e., women. To the contrary, Plaintiff admits that it was women who were

actually benefiting from the "policy."

---

cannot prove a causal connection between her complaints and the denial of the above promotions, and this is clearly
her burden.

In sum, Plaintiff has utterly failed to establish a prima facie claim for disparate treatment under Title VII.

## III.   Plaintiff Has Failed To Establish a Claim For Retaliation Under Title VII.

### A.   eBay's Retaliation Claim Must Be Dismissed Because Plaintiff Did Not Present the Claim to the UALD/EEOC In Her Charge of Discrimination.

As a threshold matter, Plaintiff's retaliation claim must be dismissed because Plaintiff failed to present her complaint of retaliation to the UALD/EEOC in her Charge of Discrimination.[32] Plaintiff marked only the "sex" and "national origin" boxes on her Charge; she did not mark the "retaliation" box. *See* Charge (Ex. 3). "Although [Plaintiff's] failure to mark the box set for [retaliation] is not dispositive, it certainly creates a presumption that she was not asserting claims represented by boxes not checked." *See Gunnell*, 152 F.3d at 1260. And, there is nothing in the remainder of her Charge to rebut that presumption. Indeed, although Plaintiff went to great detail in her Charge to outline the conduct she thought actionable, nowhere in her discrimination statement does she mention the word retaliation, or state that eBay took some sort of adverse employment action against her for engaging in protected activity. To the contrary, Plaintiff's Charge simply and only complains of general harassment at the hands of her supervisor, Porter. Because Plaintiff has failed to exhaust her administrative remedies with regard to her retaliation claim, the claim must be dismissed as a matter of law. *See id.*

### B.   Even If Plaintiff Did Exhaust Her Administrative Remedies, Her Retaliation Claim Clearly Fails On the Merits.

According to Plaintiff, the retaliation of which she complains occurred *after* she complained about Porter's conduct to Scott Newman, eBay's Vice President of Customer

---

[32]      The filing of a discrimination charge with either a state or federal administrative agency is a prerequisite to asserting a Title VII discrimination claim in federal court. *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1260 n. 2 (10th Cir. 1998).

Support, on November 15, 2001.[33]  Plaintiff alleges that the retaliation consisted of the following:

- Receiving a written warning for misusing her personal eBay account;

- Receiving "substandard" reviews;

- Certain supervisors, i.e., Janet Farson and Nita Call, "were very cold in their demeanor" to Plaintiff;

- Plaintiff's supervisor, Brent Boutwell, allegedly started keeping "records in [Plaintiff's] personnel file about any little thing [Plaintiff] said or did";

- Plaintiff's supervisors allegedly "talked amongst themselves" about Plaintiff's complaints concerning Porter;

- Plaintiff's desk was moved into an area where she was unfamiliar with her co-workers, making her feel "uncomfortable."[34]

In order to make out a prima facie case of retaliation, Plaintiff must prove: "(1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer; and (3) a causal connection between the protected activity and the adverse action." *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir. 1993).  If Plaintiff establishes this prima facie case, the burden shifts to eBay to articulate legitimate, nondiscriminatory reasons for the employment decisions. *See, e.g., Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1079 (10th Cir. 1999).  Plaintiff must then demonstrate that the proffered reasons were not the true reason, i.e., pretext. *See id*.  Plaintiff bears the burden of persuasion throughout the entire process.

---

[33]     *See* Kuczmanski Depo. (Ex. 1) at 144:13-18 ("Q:  [D]id the retaliation all occur after you filed your charge with the E.E.O.C in February of 2002?  A:  It started when I filed—when I filed that complaint to Scott Newman [on November 15, 2001].").

[34]     *See* Kuczmanski Depo. (Ex. 1) at 141:22-25; 143:19-25; 144-146; 147:2-8; 148:2-14; 150:5-11, *and* Pl.'s Responses to Def.'s First Set of Interrogs. (Ex. 4), Response to Interrog. 9.

As discussed below, none of Plaintiff's six (6) allegations of retaliation can establish a prima facie case of retaliation because (1) they do not constitute adverse employment actions as a matter of law; and/or (2) Plaintiff has no evidence whatsoever to establish a causal connection between the protected activity and the alleged adverse actions; and/or (3) eBay had a legitimate, nondiscriminatory reason for engaging in the challenged activity.

> 1.   *eBay Had a Legitimate Business Reason For Counseling Plaintiff For Misusing Her Personal eBay Account; Further, Plaintiff Admits That She Has No Evidence Proving the Counseling At Issue Was Retaliatory.*

In December 2001, Plaintiff was issued a final written warning for misusing her personal eBay trading account. *See* Final Warning (Ex. 13). Although Plaintiff argues that this warning was retaliatory, she admits that eBay had a legitimate, nondiscriminatory reason for issuing the warning. In point of fact, Plaintiff admits (1) that she misused her personal account by bidding on an item on eBay's website without first identifying that she was an eBay employee, and then sending the customer a "nasty e-mail" when she didn't get the merchandise, accusing the seller of "fraud" and informing him at that time that she worked for eBay and that the seller should have been "suspended [from eBay]"; (2) that her conduct "violated eBay policy" in numerous ways; and (3) that other eBay employees had been fired for similar misconduct.[35] Certainly, eBay was justified in counseling Plaintiff for the above undisputed misconduct.

Equally as important, Plaintiff admits that she has no evidence whatsoever, other than her own speculation and conjecture, establishing that the above warning was retaliatory:

Q:   Okay. You alleged in your complaint, Ms. Thornton, that you believe that this final warning was retaliation for your reporting Mr. Porter's conduct to Scott Newman.

A:   Yes.

---

[35]   *See* Kuczmanski Depo. (Ex. 1) at 137:21-22 ("Q: Did your conduct violate eBay policy? A: Yes."); 138:4-5 ("Q: Should you have sent the nasty e-mail? A: No."); 141:13-16 ("Q: Are you aware of any eBay employees who have been fired . . . for misusing their eBay account. A: Yes.").

Q:     Why do you believe that it was retaliation for that?
A:     Because I don't—*I think* that Janet and Nita [(the supervisors who issued the warning)] got in trouble, and they were really mad at me for reporting all of those problems to Scott Newman and going over their head . . . .
Q:     *What facts do you have that support that belief?*
A:     *I don't have any facts*. . . .
Q:     They didn't tell you they were angry?

                                                                * * *

A:     No.
Q:     They didn't tell you they were going to punish you somehow?
A:     No.

Kuczmanski Depo. (Ex. 1) at 141:22-25; 142:1-19.

Plaintiff's mere subjective belief and speculation that the above warning was retaliatory

is clearly insufficient, as a matter of law, to support a claim for retaliation under Title VII.

> 2.     *Plaintiff's Performance Reviews Were Not Discriminatory; To the Contrary, They Were Based On the Undisputed Facts, Completely Objective and Justified By Her Performance.*

In addition to the above, Plaintiff alleges that eBay retaliated against her by giving her a

"substandard" performance review for the year 2002. *See* Kuczmanski Depo. (Ex. 1) at 146:1-7.

Plaintiff admits in her deposition, however, that her performance review was objective, and was

justified by her performance.  Further, as her deposition testimony makes clear, Plaintiff has no

evidence whatsoever establishing that anything in her performance review was retaliatory, nor

could she.

Plaintiff's performance review for the year 2002, like all similarly situated eBay

employees, was based on the following categories:  (1) Quality (assisting eBay members with

accurate and complete information to their questions); (2) Productivity (the average number of

messages and searches handled per hour); (3) Attendance; (4) Working With Others; (5)

Flexibility; and (6) Customer Focus. *See* Plaintiff's 2002 Performance Review, at 1-2. (Ex. 15).

In the categories of Quality, Flexibility, and Customer Focus, Plaintiff received a rating of 3,

which, as her performance review makes perfectly clear, is an "appropriate [rating] for the
majority of the workplace," and means that Plaintiff "met[] and occasionally exceed[ed] eBay's
high expectations." *See id.* at 3 (emphasis in original).  Nowhere in Plaintiff's answers to eBay's
Interrogatories, or in her deposition, does Plaintiff genuinely allege that her 2002 rating in these
categories, i.e., Quality, Flexibility, and Customer Focus, was substandard, unfair or unjustified
in any way.[36]

In the category of Productivity, Plaintiff received a rating of 2, which meant that eBay's
expectations "had not been fully achieved." *Id.* at 3.  Although Plaintiff states that she was
"disappointed" in this rating, she admits, as she must, that Productivity is an "objective" criteria
that is based on the average number of messages and searches handled per hour, *see* Kuczmanski
Depo. (Ex. 1) at 146:1-25, 147:1, and therefore, there is nothing a supervisor could do to affect
this rating, either positively or negatively.  *See id.*  And, perhaps most importantly, Plaintiff
admits in her deposition that she, in fact, "did have low productivity and low quality" for the
year 2002.  *Id.* at 303:13-15.  Quite simply, Plaintiff has failed to offer any evidence, other than
her own speculation, that her Productivity rating for 2002 was substandard, unfair or
unjustified.[37]

---

[36]     Although it is hardly worth mentioning, Plaintiff does state in her answers to eBay's
interrogatories that her Quality rating did not adequately reflect her actual performance because "in April 2002, QC
changed from a weighted scoring to an all or nothing (100% or 0%) scoring system."  Pl.'s Responses to Def.'s First
Set of Interrogs. (Ex. 4), Response to Interrog. 9.  Plaintiff, however, ignores that this change was applied across the
board at eBay, i.e., it affected all eBay employees in the same way, and therefore, Plaintiff was not treated
differently than any other eBay employee in this regard.  *See* Kuczmanski Depo. (Ex. 1) at 282:4-6 ("Q:  Everyone
on you team was subject to the same criteria, correct?  A:  Yes.").  Moreover, Plaintiff has failed to come forward
with any evidence whatsoever to prove that the above change in assessing Quality was retaliatory, nor could she.
Quite simply, the fact that Plaintiff did not like the above change in policy is simple irrelevant.

[37]     Plaintiff's only complaint regarding her Productivity rating is that although her productivity was
indeed low, she "continued to work on it and increase[] [it]."  This statement is actually correct.  Indeed, Plaintiff's
2002 Performance Review explicitly states that Plaintiff's productivity "showed a dip in the middle year," but that
Plaintiff had "increased her productivity" toward the end of the year.  *See* 2002 Performance Review (Ex. 15) at 1.
Although Plaintiff did increase her productivity, her argument misses the point entirely.  Plaintiff's 2002 review was
a _yearly_ review, i.e., it took into consideration Plaintiff's performance for the entire year of 2002.  Therefore, the
fact that Plaintiff may have increased her productivity towards the end of the year is irrelevant, in and of itself.

In the category of Attendance, Plaintiff received a rating of 1, which is "below an acceptable level." *See* Plaintiff's 2002 Performance Review (Ex. 15) at 1 & 4.   As her performance review makes clear, Plaintiff was given this rating due to "9 Attendance and 11 Adherence occurrences" in 2002.   *See id.* at 1.   Like Productivity, Attendance/Adherence is an objective criteria, and Plaintiff has made no argument that these Attendance/Adherence occurrences were improperly recorded.[38]

Finally, in the category of Working With Others, Plaintiff received a rating of 2 (expectations not fully met).   *See id.* at 2.   This rating was due to the fact that Plaintiff had "some issues with her attitude displayed on the floor."   *Id.*   Specifically, Plaintiff's supervisor, Brent Boutwell, reported that Plaintiff "consistently made comments about not wanting to work [at eBay], and how she was recognized in support but not since she moved over [to CSR]."   *Id.*   On page 303 of her deposition Plaintiff inexplicably states that she did not make such comments. *See* Kuczmanski Depo. (Ex. 1) at 303:17-19.   However, on page 302, Plaintiff states that she did, in fact, make such comments, but that they were made to Brent Boutwell in private.   Moreover, and perhaps most importantly, Plaintiff did not indicate in the "Employee Comments" section of the 2002 Performance Review that Brent Boutwell had made false statements.   *Id.* at 303:24-25; 304:1.   The law is well settled that Plaintiff cannot create a material issue of fact by, in bald and conclusory statements, contradicting her sworn deposition testimony, especially where, as here, she has offered no explanation whatsoever for the disparity between her conflicting statements.[39]

---

[38]    Indeed, Plaintiff's 2002 Performance Review has a section entitled "Employee Comments."  *See* 2002 Performance Review (Ex. 15) at 4.  In this section, Plaintiff took the time to state that she was "disappointed with [her] review" because she felt, albeit unjustifiably, that it did not reflect "[her] Productivity and hard work ethic."  *See id.*  However, Plaintiff never stated that she was improperly allotted Attendance/Adherence occurrences. *See id.*

[39]    *See, e.g., Asa-Brandt v. ADM Investor Servs., Inc.,* 138 F. Supp. 2d 1144, 1161 (N.D. Iowa 2001) ("[A]n affidavit inherently contradicting the prior deposition testimony of the affiant and containing no explanation or clarification for the disparity fails to generate a genuine issue of material fact."); *Olin v. Disneyland International,*

Finally, in addition to the fact that Plaintiff's 2002 Performance review was objectively justified by Plaintiff's performance (or lack thereof), Plaintiff has failed to come forward with any evidence whatsoever that her review by a different manager, if it was incorrect in some way, was retaliatory. Indeed, Plaintiff's argument is apparently this: I believe my review was substandard, and because it was substandard, it must have been retaliatory. This is clearly insufficient proof. Indeed, to survive summary judgment, Plaintiff must come forward with credible evidence, not simply surmise and conjecture, that the deficiencies in her review were causally connected with her charge of discrimination, which Plaintiff has clearly failed to do. Indeed, no reasonable juror could conclude from the above undisputed facts that Plaintiff's 2002 Performance Review was retaliatory.[40]

3.    *Plaintiff's Remaining Allegations of Retaliation Do Not Constitute Adverse Employment Actions As a Matter of Law; Further, Plaintiff Admits That She Has No Evidence To Prove the Remaining Allegations Were Retaliatory.*

Plaintiff's remaining allegations of retaliation consist of the following: (1) certain supervisors, i.e., Janet Farson and Nita Call, "were very cold in their demeanor" to Plaintiff; (2) Plaintiff's supervisor, Brent Boutwell, allegedly started keeping "records in [Plaintiff's] personnel file about any little thing [Plaintiff] said or did"; (3) Plaintiff's supervisors allegedly "talked amongst themselves" about Plaintiff's complaints concerning Porter; and (4) Plaintiff's

---

832 F. Supp 1342, 1345 (D. Ariz. 1993) ("[P]laintiff could not use contradictory testimony to defeat a motion for summary judgment. . . .").

[40]    Plaintiff also alleges that Scott Newman's administrative assistant, Laurie Lou Chambers, "edited out a lot of positive comments that [plaintiff's supervisor] had written about [her.] *See* Kuczmanski Depo. (Ex. 1) ay 304:1-5. As Plaintiff's deposition testimony makes clear, Plaintiff purportedly heard this from Brent Boutwell, a supervisor, who purportedly heard it from Chambers. This testimony is clearly double-hearsay (hearsay within hearsay), and is certainly not admissible as evidence, even at the summary judgment stage. *See* Fed. R. Evid. 802; Fed. R. Evid. 805; *Herrick v. Garvey*, 298 F.3d 1184, 1191 n. 4 (10th Cir. 2002) (hearsay evidence insufficient to meet burden of avoiding summary judgment); *Adams v. American Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment. . . ."). Moreover, Plaintiff admits that she failed to report the above alleged misconduct to anyone at eBay. *See* Kuczmanski Depo. (Ex. 1) at 303:19-25; 304:1-7 ("Q: And Brent told you that she had edited positive comments out of your evaluation? A: Yes. Q: Did you talk to anyone about this? A: No. Q: Did you report it to H.R.? A: No. Did you report it to your—Brent Boutwell's supervisor? A: No. . . . ").

desk was moved into an area where she was unfamiliar with her coworkers, making her feel

"uncomfortable." These allegations cannot constitute retaliation as a matter of law.

>    i.    The Remaining Allegations Do Not Constitute "Adverse
>           Employment Actions."

In *Ellerth*, the Supreme Court offered the following definition of an adverse employment

action: "A tangible employment action constitutes a significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." 524 U.S. 742, 118 S.Ct.

2257, 2268–69 (1998) (emphasis added). *See also Petersen v. Utah Dept. of Corrections*, 301

F.3d 1182, 1189 (10th Cir. 2002) (stating that "[t]he employer's retaliation must be ***materially***

***adverse*** employment action." (emphasis added) (internal quotations omitted)).

In applying this standard, the Tenth Circuit has stated: "We doubt that few actions

identifiably taken by co-workers [or supervisors], which generally seem to involve incidents of

rudeness, are sufficient to support a claim for retaliation, given that Title VII neither is a 'general

civility code' nor does it make actionable the 'ordinary tribulations of the workplace.'" *Gunnell*

*v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998). Accordingly, the Tenth

Circuit has held that "avoiding" an employee or "acting formally" toward an employee after a

discrimination charge is filed does not constitute adverse employment action, *see Fortner v.*

*State of Kansas*, 934 F. Supp. 1252, 1268 (D. Kan. 1996), *aff'd* 122 F.3d 40 (10th Cir. 1997); that

"mere criticism and counseling alone do not constitute 'adverse employment action[s],'" *id.* at

1267 (quotation omitted); and that treating an employee "almost contemptuously" and subjecting

her to "isolation treatment" do not constitute adverse employment actions. *Beaver v. Prudential Ins. Co. of America*, No. 94- 4181-DES, 1996 WL 109547, at *5 (D.Kan. Feb. 1, 1996).[41]

Here, Plaintiff's remaining allegations of retaliation merely consist of supervisors having a "very cold demeanor"; supervisors keeping "records in [Plaintiff's] personnel file about any little thing [Plaintiff] said or did"; supervisors allegedly "talk[ing] amongst themselves" about Plaintiff's complaints concerning Porter; and supervisors moving Plaintiff's desk into an area where she felt "uncomfortable." These allegations, however, like the retaliation alleged by the plaintiffs in *Fortner, Meridith* and *Beaver*, are far too ephemeral in nature and effect as to be considered a "materially adverse employment action" for purposes of Title VII, especially considering the fact that Plaintiff has failed to prove, and cannot prove, that any of her remaining allegations of retaliation affected her benefits, her rate of pay, her performance evaluations, her chances for promotion, or any other term and/or condition of her employment. Indeed, Plaintiff admits in her deposition that "despite the problems [she] was having, [she] was still able to do [her] job, perform [her] job functions, and perform adequately at eBay." Kuczmanski Depo. (Ex. 1) at 294:15-19.

          ii.      Regardless, Plaintiff Admits She Has No Evidence Whatsoever Proving the Remaining Allegations Were Retaliatory.

Even if the remaining allegations of retaliation could constitute "adverse employment actions" (and they cannot, as a matter of law), Plaintiff admits that she has no evidence whatsoever to demonstrate that the remaining allegations were retaliatory:

Q:     Anything else that you think constituted retaliation?

---

[41]     Other federal courts have come to similar conclusions. *See, e.g., Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997) (holding that hostility from fellow employees, ridicule and resulting anxiety did not constitute adverse employment action due to their "lack of consequence"); *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997) (requiring that actions rise to the level of ultimate employment decisions to be adverse employment actions under Title VII).

A:      . . . Brent Boutwell started keeping records in my personnel file about any little thing I said or did.  If I said, "Oh, I don't like this policy," he'd write it down.  You know, he didn't do that to other people.

Q:      *How do you know . . . whether he kept notes about other people or not? You never saw their files, did you*?

A:      *No.*

Q:      *So how do you know whether he kept notes on other people or not*?

A:      *I don't know.*

\* \* \*

Q:      Anything else you think that constituted retaliation?

A:      I just think that, you know, talking amongst supervisors, I was . . . viewed as a poor employee because of complaining about Chris Porter. . . .

Q:      *Did anyone ever tell you that [your supervisors] talked about you and your complaints*?

A:      *No.*

Q:      *Did any supervisor ever tell you that he or she had heard that you made these complaints*?

A:      *Not that I recall.*

\* \* \*

Q:      *Okay. Did any of them – did anybody ever tell you the supervisors have heard that you make complaints*?

A:      *Not that I'm aware of.*

\* \* \*

Q:      Any other evidence of retaliation by eBay . . . .

A:      Yes. I was in investigations, and for – for an unknown reason, they decided to move my desk . . . with a bunch of people who I didn't even know. . .

\* \* \*

Q:      *Do you know who made the decision to move your desk*?

A:      *No.*

Q:      *Do you know why the decision was made to move your desk*?

A:      *No . . . .*

\* \* \*

Q:      *Other than the mere fact that you were moved, do you have any evidence that it was done in retaliation for anything*?

A:      *I don't know what the motives were for moving me.*

Kuczmanski Depo. (Ex. 1) at 147-151; 153:7-11 (emphasis added).

In sum, the undisputed facts clearly establish that Plaintiff's six (6) allegations of

retaliation clearly fail because (1) they do not constitute adverse employment actions as a matter

of law; and/or (2) Plaintiff has no evidence whatsoever to establish a causal connection between

the protected activity and the alleged adverse actions; and/or (3) eBay had legitimate,

nondiscriminatory business reasons for engaging in the challenged activity.  Thus, Plaintiff's

retaliation claim should be dismissed in its entirety as a matter of law.

**IV.    Plaintiff's Common-Law Negligence Claim Must Be Dismissed For Three Independent Reasons: It Is Barred By the Utah Workers' Compensation Act; It Is Barred By the Utah Anti-Discrimination Act; and It Is Duplicative of Plaintiff's Title VII Claim.**

   A.    Plaintiff's Negligence Claim Is Barred By the Utah Workers' Compensation Act As a Matter of Law.

Plaintiff's Third Cause of Action asserts a claim against eBay for common-law

negligence.  *See* Pl.'s Compl. (Ex. 2) at ¶¶ 122–29.  Specifically, Plaintiff alleges that eBay

breached its duty of reasonable care by failing to take appropriate remedial action to protect her

from being subjected to sexual harassment.  *See id.* at ¶¶ 124-26.  Under well-established Utah

law, Plaintiff's common-law negligence claim must be dismissed because it is barred by the

exclusive remedy provision of the Utah Workers' Compensation Act (the "Act").

The Act provides:

> [t]he right to recover compensation pursuant to this chapter for injuries sustained by an employee . . . shall be the ***exclusive remedy against the employer*** and . . . the liabilities of the employer imposed by this chapter shall be in place of any and all other civil liability whatsoever, at common law or otherwise . . . on account of any accident or injury or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of  . . .the employee's employment. . . .

Utah Code Ann. § 34A-2-105(1) (2001) (emphasis added).  Accordingly, "[i]nsofar as the

negligence of the employer is involved . . . workmen's compensation constitutes the exclusive

remedy against the employer."  *Star v. Indus. Common,* 615 P.2d 436, 437 (Utah 1980).

In applying the above principles, ***each and every court,*** both state and federal, address

the issue of whether a common-law negligent supervision claim (like Plaintiff's here) is barred

by the Utah Workers' Compensation Act, has held unequivocally that such a claim is barred by

the Act.  For example, in *Retherford v. AT&T Communications*, 844 P.2d 949 (Utah 1992), the

Utah Supreme Court explained that if an employee suffers any injury compensable under the Act, the exclusive remedy provision should bar a separate negligence action for those injuries. *Id.* at 965. *Retherford* identified the injuries intended to be addressed by the Act as "physical or mental injur[ies]." *Id.* Because "physical and mental" injuries are an indispensable element of *any* negligent supervision claim, the *Retherford* court expressly stated that the Act should bar a claim for negligent supervision. *Id.* at 965 n. 8.

Relying on *Rutherford*, this Court—in *Matthews v. Kennecott Utah Copper Corp.*, 54 F. Supp. 2d 1067, 1075 (D. Utah 1999) (Judge Benson) and in *Andresen v. McDonnell Douglas Corp.*, Civ. No. 89-C-0163-S, 1991 WL 96053, *4 (Feb. 22, 1991 D. Utah) (Judge Sam)[42]—has expressly held that negligent supervision claims (like Plaintiff's here), in which employees alleged that their employers were "negligent" because they failed to take appropriate remedial action to protect them from sexual harassment, were barred by the exclusive remedy provision of the Act.

Factually, this case is identical to *Andresen, Matthews,* and *Rutherford*, and compels the same result: Plaintiff's negligent supervision claim is barred, as a matter of law, by the Utah Workers' Compensation Act. Indeed, to decide otherwise under the facts of this case would effectively invalidate the above well-established case law.

B.   Plaintiff's Negligence Claim Is Barred By the Utah Anti-Discrimination Act As a Matter of Law.

Even if Plaintiff's negligence claim is not barred by the exclusive remedy provision of the Utah Workers' Compensation Act (and it unquestionably is), it is nevertheless precluded by the exclusive remedy provision of the Utah Anti-Discrimination Act. The Utah Anti-Discrimination Act expressly precludes common-law rights of action for discrimination: "The

---

[42]      Pursuant to this Court's local rules, a copy of the *Matthews* and *Andresen* cases are attached hereto as Exhibit 17.

procedures contained in this section are the ***exclusive remedy under state law for employment discrimination*** based upon, race, color, *sex*, retaliation, . . . age, religion, national origin, or disability." Utah Code Ann. § 34A-5-107(15) (2001) (emphasis added).  As it must, this provision has been interpreted as "foreclosing any claim outside of the Act arising from the very behavior and conduct expressly prohibited by the Act." *Sauers v. Salt Lake County*, 735 F. Supp. 381, 386 (D. Utah 1990).

However packaged and presented, Plaintiff's negligence claim is, like the claim at issue in *Sauers*, merely a common-law cause of action based upon and arising from alleged conduct in the nature of sexual discrimination by reason of sexual harassment in the workplace.  Indeed, Plaintiff's negligence claim specifically alleges that eBay failed to properly investigate her complaints of sexual harassment, and failed to take appropriate remedial action to protect her from being subjected to sexual harassment, and that, because of this negligence, Plaintiff suffered discrimination in the form of sexual harassment from eBay employees.  *See* Pl.'s Compl. (Ex. 2) at ¶¶ 124–27.  This is the very conduct, however, that is expressly prohibited by the Utah Anti-Discrimination Act.  *See* Utah Code Ann. § 34A-5-106(1)(a)(i).  Therefore, Plaintiff's common-law negligence claim is clearly foreclosed by the Act.  *See Andresen* (Ex. 17), 1991 WL 96053, Ex. 14, at *4 (holding that a plaintiff's negligent supervision claim, which asserted, like Plaintiff's claim here, that her employer was negligent by failing to protect her from sexual harassment, was precluded by the Utah Anti-Discrimination Act as a matter of law); *Sauers*, 735 F. Supp. at 386 (holding that plaintiff's common-law cause of action for sexual harassment was precluded by the Utah Anti-Discrimination Act).

C.   Plaintiff's Negligence Claim Must Be Dismissed, As a Matter of Law, Because It is Duplicative of Her Title VII Claim.

Finally, even if Plaintiff's negligence claim is not barred by either the Utah Workers' Compensation Act or the Utah Anti-Discrimination Act (and it is clearly barred by both), it still must be dismissed, as a matter of law, because it is duplicative of Plaintiff's Title VII claim.

In *Crosten v. Kamauf*, the plaintiff, like Plaintiff here, asserted a cause of action alleging that her employer negligently failed to supervise its employees and to prevent sexual harassment, while also asserting, like Plaintiff here, a separate cause of action for sexual harassment under Title VII.  932 F. Supp. 676, 683 (D. Md. 1996).  In dismissing the plaintiff's negligence claim as duplicative of her Title VII claim, the court noted: "reasonableness within the meaning of tort law is not a floating concept, but is itself rooted in public policy.  In the context of hostile environment sexual discrimination, ***the source of the policy is statutory and exclusively statutory, arising out of Title VII and its state counterpart*.**"  *Id.* at 684 (emphasis added) (internal quotations omitted).  Accordingly, the court held that the plaintiff's negligence claim, like Plaintiff's negligence claim here, attempted to do nothing more than "impose liability on [the plaintiff's employer] for its alleged failure to conform to the dictates of Title VII in its efforts to prevent sexual harassment, [and] to properly respond to a report of sexual harassment." *Id*; *see also Metcalf v. Metropolitan Life, Inc.*, 961 F. Supp. 1536, 1546 (D. Utah 1997) (dismissing plaintiff's negligent employment claim because it was "wholly subsumed" in plaintiff's Title VII claim); *Perry v. FTData, Inc.*, 198 F. Supp. 2d 699, 707 (D. Md. 2002) (dismissing negligence claim as duplicative of Title VII claim).

For the same reasons articulated in *Crosten*, Plaintiff's negligence claim should be dismissed, as a matter of law, on the ground that it is entirely duplicative of her Title VII sex discrimination claim.

**V.      Plaintiff Has Failed To Establish A Claim For Assault.**

The tort of assault consists of an act *intended* to cause either harmful or offensive contact

with another person or apprehension of such contact, and that creates in that other person's mind

a *reasonable* apprehension of an *imminent* battery.  Restatement (Second) of Torts § 21 (1965);

*see also Banks v. Shivers*, 432 P.2d 339, 340 (Utah 1967).  It is well-established that words alone

"do not make the actor liable for assault unless together with other acts or circumstances they put

the other in reasonable apprehension of an imminent harmful or offensive contact with his

person."  Restatement (Second) of Torts, § 31.

Here, Plaintiff's assault claim arises out of the following primary events:

- On or about "October 28, 2000," Porter allegedly "scream[ed]" at Plaintiff in front of "several coworkers" because Plaintiff told a customer to "call [her] back."[43]

- "[T]owards the end of April 2001," Porter allegedly "scream[ed]" at Plaintiff for failing to "log into the logbook."  According to Plaintiff, Porter allegedly "pounded" the log book with his hand while he was yelling at Plaintiff.  Plaintiff also alleges that during this encounter, one of Plaintiff's coworkers, Keith List, told Porter not to yell at Plaintiff in front of other coworkers, and that Porter then approached List "with clenched fists" and told him "to mind his own business."[44]

- "On September 11, 2001," Plaintiff and another coworker were discussing the terrorist attack on the World Trade Center in New York City.  Porter allegedly overheard this conversation and stated to Plaintiff:  "I have a 9mm gun, and I'm going to kill any terrorist who steps foot on my property."[45]

---

[43]        *See* Kuczmanski Depo. (Ex. 1) at 33-34, *and* Pl.'s Responses to Def.'s First Set of Interrogs. (Ex. 4), Response to Interrog. 13.

[44]        *See* Kuczmanski Depo. (Ex. 1) at 57-58, *and* Pl.'s Responses to Def.'s First Set of Interrogs (Ex. 4), Response to Interrog. 13.

[45]        *See* Kuczmanski Depo. (Ex. 1) at 84-86, *and* Pl.'s Responses to Def.'s First Set of Interrogs (Ex. 4), Response to Interrog. 13.

For the reasons discussed below, ***none*** of these allegations can support a cause of action for assault as a matter of law.[46]

A.    Plaintiff's Allegations of "Verbal Abuse" Are Time-Barred.

The applicable statute of limitations period for intentional torts such as assault and battery is one year.  Utah Code Ann. § 78-12-29(4) (2003).  Plaintiff filed her Complaint on September 6, 2002.  Thus, with regard to Plaintiff's assault claim, any and all incidences occurring prior to September 6, 2001—i.e., the incidences of alleged "verbal abuse" occurring on "October 28, 2000" and "towards the end of April 2001," respectively—are time-barred by the statute of limitations and cannot support a recovery by Plaintiff.

B.    Even If They Are Not Time-Barred, Plaintiff's Allegations Of "Verbal Abuse" Cannot Constitute Assault As a Matter of Law.

The October 2000 and April 2001 incidences, even if taken as true, are insufficient to support Plaintiff's claim for assault as a matter of law.  First, although Plaintiff alleges that Porter screamed and yelled at her for violating eBay employee policies in October 2000 and April 2001, she stops far short of alleging that Porter *ever* directly or indirectly threatened or offered to do her bodily injury.  *See* Kuczmanski Depo. (Ex. 1) at 33 & 57-58; *see also id.* at 345 (admitting that Porter never actually threatened Plaintiff with bodily harm).  In fact, Plaintiff admits that she is unaware of any instance where Porter physically hurt, or threatened to hurt, anyone, at work or elsewhere.  *See id.* at 350.

Second, in addition to the fact that Plaintiff has failed to even allege that Porter threatened her during the October 2000 and April 2001 incidents, there were no other alleged

---

[46]    Plaintiff also alleges, in scattershot fashion, that Porter would "belittle her accomplishments"; tell her she "had no common sense"; and that he would meet her requests for assistance "with sarcasm."  Pl.'s Responses to Def.'s First Set of Interrogs (Ex. 4), Response to Interrog. 13.  These allegations of arguably discourteous behavior, however, clearly do not rise to the level of conduct even approaching the atrocity required for civil assault.  Indeed, to decide otherwise would effectively turn every rude or obnoxious comment into an actionable, intentional tort.

acts or circumstances occurring during these incidents which could create a "reasonable" apprehension of imminent harmful or offensive contact.  Although Plaintiff makes much to-do of the alleged fact that Porter pounded his hand on a log book while he was yelling at her, numerous courts have held that such actions do not constitute assault as a matter of law.  *See Castro v. Local 1199, National Health*, 964 F. Supp. 719, 731-732 (S.D.N.Y. 1997) (finding no assault where supervisor who was "visibly angry" and "red in the face," violently "slammed his hand on the table," and threatened employee that she "could lose more than [her] job."); *Stump v. Wal-Mart Stores, Inc.*, 942 F. Supp. 347, 350 (E.D. Ky. 1996) (holding that employer's conduct during termination meeting—where employer yelled at employee, "struck his fist on the table," and demanded that employee admit to stealing certain items—was insufficient to create reasonable apprehension of imminent physical harm); *Williams v. Port Authority of New York and New Jersey*, 880 F. Supp 980, 994 (E.D.N.Y. 1995) (finding that no assault occurred where supervisor "backed [employee] against a wall" while reprimanding him, and threatened to "get him")

Like the above cases, there is no evidence or even an allegation in the instant case that Porter was intending to strike Plaintiff but missed and hit the log book instead.  Nor is there any evidence or allegations that Porter was intending to make Plaintiff believe that he was going to strike her.  Indeed, Plaintiff fails to even allege such facts.  Accordingly, based on the facts as Plaintiff has herself alleged them, there could have been no reasonable, imminent apprehension of a harmful or offensive conduct *as a matter of law*.

C.   Porter's Statement That He Would "Kill Any Terrorist Who Stepped Foot On His Property" Cannot Constitute Assault As a Matter of Law.

Like the October 2000 and April 2001 incidences discussed above, Plaintiff's allegation that Porter allegedly stated he would "kill any terrorist that stepped foot on his property" is

insufficient to constitute assault. As an initial matter, Plaintiff has offered no evidence whatsoever to demonstrate that the above statement was even directed at her. In fact, the only "evidence" that Plaintiff proffers to prove that the above statement was directed at her is that she is "Arabic," and that, according to Plaintiff, the "general public . . . associate Arabics or Middle Eastern people with being terrorists." *See* Kuczmanski Depo. (Ex. 1) at 86:1-25. However, Porter testified that he did not know Plaintiff was Arabic. *See* Porter Depo. Vol. II (Ex. 5) at 20:8-11. Regardless, Plaintiff's stereotypical generalization that the "general public" associates Arabics with terrorism is based entirely on mere speculation and conjecture, and clearly is not admissible evidence.

However, even if the above alleged "threat" was directed at Plaintiff (and it wasn't), it was, on its face, "forward-looking," and numerous courts and commentators have held that forward-looking threats do not constitute assault as a matter of law. For example, in *Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp. 2d 1314, 1336 (M.D. Fla. 2002), the plaintiff, an African-American employee of Wal-Mart, alleged that his supervisor committed assault by commenting that the employee should "remember how [they] did blacks back in the thirties when they got out of hand . . . we would take them out back and lynch them," and that he used guns like the ones sold in the store "to shoot blacks." *Id.* at 1319. In dismissing the Plaintiff's civil assault claim, the court stated that the supervisor's remark, however inappropriate and boorish, was forward-looking, and therefore, "[n]o reasonable person could find that [the supervisor] put [the plaintiff] in fear of ***imminent peril.***" *Id.* at 1336 (emphasis added). The court noted that the supervisor had no gun at the time, nor any mechanism to harm the plaintiff, and the supervisor did not in any way have the present ability to effectuate his "threats." *Id.*[47]

---

[47]     *See also* Restatement (Second) of Torts, § 31, cmt. a, ill. 2 ("A, during a quarrel with B, half-draws his sword from its scabbard and says, 'If it were not assize time, I would not take such language from you.' A

Like *Lawrence*, there is no evidence or even allegations in this case that Porter had a gun at the time he made the above inappropriate remark, or any mechanism to harm Plaintiff, or that Porter in any other way had the *present* ability to effectuate his alleged "threat." It is undisputed that Plaintiff was not on Porter's property when the above remark was made, and, as stated above, there is no evidence to suggest that Porter perceived Plaintiff as a terrorist. Under these circumstances, Porter's alleged remark about killing terrorists, however inappropriate, cannot constitute assault as a matter of law.

<b><u>CONCLUSION</u></b>

Based upon the foregoing, eBay respectfully submits that it is entitled to summary judgment as a matter of law, and therefore requests that the Court enter an order dismissing Plaintiff's claims against eBay, in their entirety, with prejudice and on the merits.

DATED:  December 12, 2003.

STOEL RIVES LLP

Matthew M. Durham
Justin B. Palmer
*Attorneys for Defendant eBay Inc.*

---

is not liable to B, but for his words, his action would amount to an assault."); *Castro*, 964 F. Supp. at 731 (finding "forward-looking" threat insufficient to constitute assault as a matter of law); *Williams*, 880 F.Supp at 994 (same).

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **MEMORANDUM IN SUPPORT OF**

**DEFENDANT EBAY INC.'S MOTION FOR SUMMARY JUDGMENT** on the following

named person(s) on the date indicated below by

    ☒  mailing with postage prepaid

    ☐  hand delivery

    ☐  facsimile transmission

    ☐  overnight delivery

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s)

at their last-known address(es) indicated below.

    Derek A. Coulter
    Jan Marshall
    The Law Office of Derek A. Coulter, P.C.
    392 East 12300 South, Suite A
    Draper, Utah  84020

    DATED: December 12, 2003.

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.